UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

| | |
|---|---|
| JEROME MARSHALL, | : |
| | : |
| Petitioner, | : |
| | : |
| v. | :    No. 03-cv-03308 |
| | : |
| JOHN E. WETZEL, Commissioner, | : |
| Pennsylvania Department of Corrections; | : |
| ROBERT D. GILMORE, Superintendent, | : |
| State Correctional Institution at Greene; | : |
| THE DISTRICT ATTORNEY OF THE | : |
|   COUNTY OF PHILADELPHIA; and | : |
| THE ATTORNEY GENERAL OF THE | : |
|   STATE OF PENNSYLVANIA, | : |
| | : |
| Respondents. | : |

_____

\*     \*     \*

APPEARANCES:

CHRISTIAN J. HOEY, ESQUIRE
MAUREEN CLAIRE COGGINS, ESQUIRE
    On behalf of Petitioner

MAX C. KAUFMAN, ESQUIRE
    On behalf of Respondents

\*     \*     \*

# **O P I N I O N**

**Petition of Jerome Marshall for Writ of Habeas Corpus Pursuant to 28 U.S.C. §2254**

**JOSEPH F. LEESON, JR.**
**United States District Judge**                                    **November 6, 2018**

# I.    INTRODUCTION

This matter is before the court on the Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 filed by petitioner Jerome Marshall on May 22, 2003 ("Original Petition").[1] On December 29, 2005, Petitioner's Memorandum of Law in Support of Petition for a Writ of Habeas Corpus was filed.[2] On December 21, 2006, respondents filed their Response to Petition for Writ of Habeas Corpus[3] and a Memorandum of Law ("Original Commonwealth Brief").[4] Petitioner's Reply Memorandum in Support of Petition for a writ of Habeas Corpus was filed on June 29, 2007.[5] Respondents filed their Sur-Reply to Petitioner's Reply Brief on September 27, 2007.[6]

This case was originally assigned to a judge of this Court on May 22, 2003, re-assigned to a second judge of this Court on July 17, 2009, re-assigned to a third judge of this Court on August 9, 2010.  The undersigned was first assigned to this case by an Order of re-assignment docketed on June 8, 2017.

Because of the lengthy period of time that intervened after the filing of petitioner's Original Section 2254 Petition, the parties later submitted updated briefing. On July 7, 2016, the Petition and Memorandum of Law of Petitioner, Jerome Marshall, in Support of His Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Amended Petition") was filed.[7] On the

---

[1]    Document 1.

[2]    Document 22.

[3]    Document 35.

[4]    Document 36.

[5]    Document 51.

[6]    Document 55.

[7]    Document 145.

same date, a Memorandum of Law of Petitioner, Jerome Marshall in Support of His Petition for a

Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Petitioner's Amended Memorandum")[8]

was filed. On May 22, 2017, the Commonwealth filed its Supplemental Response to Petition for

Writ of Habeas Corpus ("Supplemental Response").[9]

On June 6, 2018 respondents filed a Status Report[10] indicating that they agreed to a

conditional grant of petitioner's writ of habeas corpus with respect to the death sentences

imposed for the murders of Myndie McCoy and Karima Saunders. Respondents further indicated

that after consultation with the families of the victims, they would not seek new death sentences

upon resentencing in state court. On June 25, 2018, respondents filed a Status Report[11] stating

that respondents had discussed the conditional grant of petitioner's writ of habeas corpus with

the victims' families and that they now formally do not contest the conditional grant of habeas

relief concerning the two death sentences. That concession by respondents however, does not

resolve all the claims in this case.

On July 20, 2018, respondents filed a letter memorandum[12] outlining the claims that

remain for this court's resolution.[13]  Specifically, there are 17 claims that relate to the death

sentences imposed for the murders of Myndie McCoy and Karima Saunders that no longer need

---

[8]      Document 146.

[9]      Document 158.

[10]     Document 171.

[11]     Document 172.

[12]     Document 177.

[13]     The numbering of the claims presented in the Amended Petition are those utilized in respondents'
Supplemental Response.  I have chosen to utilize respondents' numbering because it is clear what each claim is in a
consecutive numbering system versus petitioner's haphazard approach.

resolution.[14] Accordingly, based upon respondents' concession, I grant petitioner habeas corpus relief on those 17 claims and vacate the death sentences for the murders of Myndie McCoy and Karima Saunders. Furthermore, I direct that this case be remanded to the Court of Common Pleas of Philadelphia County for resentencing consistent with respondents' concession that they will not seek the death penalty upon resentencing.

There are 16 claims that remain for decision by this court.[15] For the reasons discussed below, I deny the remaining portions of Jerome Marshall's habeas corpus petition.

## II.     PROCEDURAL HISTORY

### A.     State Court Proceedings.

On August 29, 1984, after a jury trial in the Court of Common Pleas of Philadelphia County, petitioner was convicted of three counts of first degree murder for the deaths of Sharon Saunders, Karima Saunders, and Myndie McKoy.[16] On August 30, 1984, the jury returned a life sentence for the murder of Sharon Saunders, and two death sentences for the murders of Karima Saunders and Myndie McKoy.[17]

Petitioner filed a direct appeal of his convictions and sentences. He was represented at trial and on his initial direct appeal by Michael McAllister, Esquire. See Marshall I. On December 22, 1989, the Supreme Court of Pennsylvania affirmed the convictions and the sentences with respect to the murders of Myndie McKoy and Sharon Saunders, but reversed the

---

[14]     Specifically, Claims I, II, IX-XII, XIV-XXII, XV and XXIX are moot based upon respondents' concession to a conditional grant of habeas relief. Those claims all relate to the death sentences themselves or the circumstances surrounding the jury imposing the death sentences.

[15]     The remaining claims that require resolution all relate to the guilt phase of petitioner's trial. They are Claims III-VIII, XIII, XXIII-XXIV, XXVI-XXVIII and XXX-XXXIII.

[16]     See Amended Petition at ¶ 2; see also Commonwealth v. Marshall, 568 A.2d 590, 593 (Pa. 1989) ("Marshall I").

[17]     Amended Petition at ¶ 3; Marshall I, 568 A.2d at 593.

death sentence for Karima Saunders based on its determination that the jury had improperly found an aggravating factor that did not apply. See id.

Specifically, the jury had found that Karima "was killed for the purpose of preventing [her] testimony against the defendant". 42 Pa.C.S.A. § 9711(d). The Pennsylvania Supreme Court explained that "[t]here was no direct or circumstantial evidence to establish the Appellant's intent at the time he murdered Karima. All that was presented was that in response to Karima's cries for her mother, Appellant killed her." Marshall I, 568 A.2d at 599. Based on the finding that the jury had improperly found an aggravating circumstance which did not apply, the court vacated the death sentence for Karima Saunders and remanded the case for a new penalty phase. Id.

A second penalty phase occurred on July 27, 1990 to sentence petitioner for the one death sentence that had been vacated.[18] On July 27, 1990, the retrial jury again sentenced petitioner to death, finding one aggravating circumstance that outweighed two mitigating circumstances.[19]

Petitioner filed a direct appeal of the re-sentence of death for the murder of Karima Saunders. On May 24, 1994, the Supreme Court of Pennsylvania affirmed the sentence. Marshall II. Petitioner was represented at the penalty phase retrial and on appeal therefrom by Bernard L. Siegel, Esquire. See id.

---

[18]      Amended Petition at ¶ 6; see also Commonwealth v. Marshall, 643 A.2d 1070, 1072 (Pa. 1994) ("Marshall II").

[19]      Amended Petition at ¶ 6; Marshall II, 643 A.2d at 1072.  The aggravating factor found by the jury was that "[t]he defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense."  Marshall II, 643 A.2d at 1072 n.2 (citing 42 Pa.C.S.A. § 9711(d)(10)).

The mitigating factors found by the jury were his lack of a significant history of prior criminal convictions, and the residual factor regarding "evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense". Id. at 1072 n.3 (citing 42 Pa.C.S.A. §§ 9711(e)(1) and (e)(8)).

On November 16, 1996, the petitioner acting pro se filed a Motion for Post-Conviction Collateral Relief. See Commonwealth v. Marshall, 812 A.2d 539, 542 (Pa. 2002) ("Marshall III"). The Post-Conviction Relief Act ("PCRA") court appointed counsel--James S. Bruno, Esquire--to represent petitioner.[20] On March 13, 1998, the PCRA court dismissed petitioner's PCRA petition without a hearing.[21] On December 18, 2002, the Supreme Court of Pennsylvania affirmed the PCRA court's ruling. See Marshall III.

**B.      Federal Habeas Corpus Proceedings.**

On May 22, 2003, petitioner filed his Original Petition.[22] This case was initially assigned to former United States District Judge Bruce W. Kauffman, who retired from the bench in 2009 as a senior judge. By Order of then Chief Judge, now Senior Judge, Harvey Bartle III, dated and filed July 17, 2009,[23] this matter was reassigned to the docket of now deceased United States District Judge Thomas M. Golden. By Order of Judge Bartle dated August 4, 2010 and filed August 9, 2010,[24] this matter was reassigned to the docket of my late colleague, United States District Judge James Knoll Gardner. By Order of former Chief Judge Petrese B. Tucker filed June 8, 2017 this case was reassigned to the undersigned.

Petitioner's Original Petition was drafted by attorneys from the Federal Community Defender Office for the Eastern District of Pennsylvania.[25] On December 10, 2014, petitioner

---

[20]      Petition at ¶ 9; see also Marshall III.

[21]      Petition at ¶ 8; Marshall III, 812 A.2d at 543.

[22]      Document 1.

[23]      Document 71.

[24]      Document 76.

[25]      See Document 1.

pro se filed a Motion to Remove Counsel, Appoint New Counsel, to Stay Proceedings and Hold in Abeyance; Tolling Time ("Motion to Remove Counsel").[26] In the Motion to Remove Counsel, petitioner alleged that he had never given consent to being represented by the Federal Community Defender Office and requested to be appointed new counsel. On December 22, 2014, counsel from the Federal Community Defender Office filed a Motion By Counsel for Petitioner to Withdraw from Representation ("Motion to Withdraw").[27]

After a hearing held on December 29, 2014, by Order of Judge Gardner dated December 29, 2014 and filed January 9, 2015,[28] he granted the Motion to Withdraw and removed the Federal Community Defender Office as counsel for petitioner. By Order dated December 29, 2014 and filed January 9, 2015,[29] Judge Gardner granted petitioner's Motion to Remove Counsel and indicated that new counsel would be appointed to represent petitioner. By Order dated and filed January 13, 2015, Judge Gardner appointed Christian J. Hoey, Esquire, and Maureen C. Coggins, Esquire, to represent petitioner in this matter.[30]

On April 1, 2015, petitioner pro se filed Petitioner's Pro Se Omnibus Motion,[31] in which he requested: (1) that court-appointed counsel be removed; (2) that all documents filed by the Federal Community Defender Office, including the Original Petition, be stricken; (3) that the court grant leave to file a new habeas corpus petition; and (4) that the court remand this matter to

---

[26]     Document 85.

[27]     Document 88.

[28]     Document 92.

[29]     Document 93.

[30]     Document 95.

[31]     Document 102.

state court for new PCRA proceedings without the involvement of the Federal Community Defender Office.

The filing of Petitioner's Pro Se Omnibus Motion prompted counsel to request a determination of petitioner's competency.[32] After a hearing held on April 22, 2015, Judge Gardner granted counsel's request for a determination of competency. Accordingly, forensic psychologist Steven E. Samuel, Ph.D. traveled to the State Correctional Institution at Graterford ("SCI Graterford") to evaluate petitioner, but he refused to meet with Dr. Samuel.[33]

Petitioner thereafter continued to request new counsel by filing Motion to Remove Counsels, Appoint New Counsels on June 2, 2015.[34] Judge Gardner held another hearing on September 17, 2015, at which time petitioner stated that he was willing to be evaluated by a different doctor appointed by the court rather than chosen by his attorneys. Petitioner also stated that he did not wish to represent himself, but would prefer to do so rather than continue to be represented by his court-appointed counsel.

Subsequently, Judge Gardner appointed Frank Dattilio, Ph.D. to evaluate petitioner, which he did on December 28, 2015. Dr. Dattilio provided the court with a psychological evaluation. On February 17, 2016, Judge Gardner held a hearing at which he elicited testimony from Dr. Dattilio. By Order and Opinion dated March 21, 2016 and filed under seal on March 23, 2016, Judge Gardner concluded that petitioner is not competent to either represent himself or

---

[32]     See Document 105 filed under seal on April 21, 2015.

[33]     Petitioner perceived that there was a conflict of interest in being evaluated by Dr. Samuel because Dr. Samuel had provided a psychological evaluation of petitioner's PCRA counsel, James S. Bruno, in connection with Mr. Bruno's past disciplinary proceedings.

[34]     Document 113.

assist counsel, denied his requests to remove counsel, and set a briefing schedule for the parties to update their original filings.[35]

On July 7, 2016, petitioner filed his Amended Petition,[36] along with Petitioner's Amended Memorandum.[37] On May 22, 2017, respondents filed their Supplemental Response.[38]

## III. STANDARD OF REVIEW

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA")[39] imposes certain procedural requirements and standards on federal courts for analyzing federal habeas corpus petitions. Specifically, the AEDPA limits habeas corpus relief for claims adjudicated on the merits by a state court. 28 U.S.C. §2254(d) (1)-(2).

Under this deferential standard, habeas corpus relief is barred unless the state court determination was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). In addition, a state court's factual findings are "presumed to be correct," and the habeas corpus petitioner "shall have the burden of rebutting

---

[35] On February 29, 2016, petitioner pro se filed a Notice of Appeal to the United States Court of Appeals for the Third Circuit (Document 137) concerning what he believed to be Judge Gardner's ruling that he is incompetent. However, at that time, Judge Gardner had not yet ruled on petitioner's competency. Ultimately, by Order and Opinion dated March 21, 2016 and filed March 23, 2016 (Documents 140 & 141), Judge Gardner determined that petitioner is incompetent to assist counsel, or to proceed pro se, and therefore denied his request to remove his counsel.

By decision of the Third Circuit dated October 25, 2016 (Third Circuit Docket No. 16-9000), the Third Circuit dismissed petitioner's appeal, ruling that his Notice of Appeal was premature because it was filed before Judge Gardner's Order and Opinion ruling on his competency.

[36] Document 145.

[37] Document 146.

[38] Document 158.

[39] See 28 U.S.C. §§ 2254(d)(1)-(2) and (e)(1).

the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Bond v. Beard, 539 F.3d 256, 263 (3d Cir. 2008).

Furthermore, a state court decision is "contrary to" United States Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389, 430 (2000).

A state court decision is an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the [habeas corpus petitioner's] case." Williams, 529 U.S. at 413, 120 S. Ct. at 1523, 146 L. Ed. 2d at 430.

The AEDPA's deferential standards do not apply "unless it is clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined in light of federal law as established by the Supreme Court of the United States." Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005) (quoting Everett v. Beard, 290 F.3d 500, 508 (3d Cir. 2002)). In cases where the AEDPA standard of review is inapplicable, "the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." Thomas v. Horn, 570 F.3d 105, 113 (3d Cir. 2009) (quoting Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001)).

Because the AEDPA's standards apply to state court decisions on the merits, they do not apply to state court adjudications denying relief based solely on procedural grounds.

**IV.  FACTS**

The following facts have been taken from the Supreme Court of Pennsylvania's decision in Marshall I, 568 A.2d 590.

On January 25, 1983, James Burley and his mother went to the Philadelphia apartment of James' sister, Sharon Saunders.  Id. at 593. They observed that the apartment was very hot with a foul odor. Id. They then discovered the bodies of Sharon, her two-year-old daughter, Karima Saunders and Myndie McKoy. Id.  Their nude bodies were found under a mattress in one of the bedrooms. Id. Additionally, Sharon's stereo and speakers were missing. Id. James and his mother called the police and reported the incident. Id.

When the police arrived at the scene, they recovered a manila envelope with petitioner's name and address along with documents indicating the time and place where he was scheduled to retrieve his welfare check. Id. On the front of the envelope was written: "Jerome and Sharon 4 ever". Id.

The police then began a search for petitioner. Id. They went to his listed address, waited for him at the bank, and visited his parents, aunts, and uncles. Id. The police also went to the home of petitioner's brother Eugene Marshall, and Eugene's wife, Irene Marshall. Id. At Eugene's home, the police observed a stereo and speakers fitting the description of the ones missing from Sharon's apartment. Id. The police obtained a search warrant for the stereo and speakers and returned to seize them. Id. at 593-594. Irene told the police that petitioner brought the stereo and speakers to their home and sold them to Eugene. Id. at 594.

Eugene told the police that he encountered his brother, petitioner, on a street corner near to where the victims lived around the time of their deaths. Id. He stated that petitioner was carrying a knife and had blood on his shirt. Id. Eugene reportedly harbored petitioner in his home

for a few days, and was aware that petitioner subsequently returned to the victims' apartment to retrieve some of his belongings and the stereo that he later sold to Eugene. Id. Most importantly, Eugene told the police that petitioner had confessed the murders to him. Id.

The police then obtained a warrant for petitioner's arrest. Id. After an extensive search, petitioner was finally apprehended on November 10, 1983 and brought to the Norristown, Pennsylvania, police station. Id. Petitioner was read his Miranda rights, and he decided to waive those rights and give a statement to the police confessing to the murders. Id. Petitioner was charged with criminal homicide for the deaths of Sharon Saunders, Karima Saunders, and Myndie McKoy. Id. at 593.

Petitioner's statement contained the following information:

> Appellant recounted that he and Sharon had been lovers and that when she told him she was to marry another he became enraged. On the day of the murders, he had sex with the twenty year old Sharon, and while she slept, he put a clothes line around her neck and strangled her to death. He then went into Myndie McKoy's room to tie her up. When she awoke and began to scream, he found a knife and stabbed her in order to quiet her and tied her up. He then dragged her into the bathroom and filled the tub up with water. She pleaded with him to leave her alone and she promised not to tell anyone and again began to scream, and then Appellant plunged Myndie's head under the water in the tub and held it there until Myndie no longer moved. Having permanently silenced Myndie, he dragged her body into Sharon's bedroom and laid her corpse next to Sharon. Appellant also admitted that he killed Sharon's two-year-old baby, Karima, by strangulation and drowning because the baby was awakened by the commotion and called out for her mother. When little Karima was dead, Appellant put her between the bodies of Sharon and Myndie and covered their bodies with a mattress.

> When he left the premises, he ran into his brother and then went to his brother's home where he changed his bloody shirt and stayed for a few days. He went back to the apartment to retrieve some of his belongings and took the stereo and speakers. He stated that he sold these items to Eugene and then left town because he knew that the Philadelphia police were looking for him.

<u>Marshall I</u>, 568 A.2d at 563-565.

## V. ANALYSIS

### A. Exhaustion of State Court Remedies.

"It is axiomatic that a federal habeas court may not grant a petition for a writ of habeas corpus filed by a person incarcerated from a judgment of a state court unless the petitioner has first exhausted the remedies available in the state courts." <u>Lambert v. Blackwell</u>, 134 F.3d 506, 513 (3d Cir. 1997); <u>see also</u> 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement is rooted in principles of comity, and it affords state courts the first opportunity to adjudicate constitutional challenges to state convictions. <u>Coleman v. Thompson</u>, 501 U.S. 722, 731, 111 S. Ct. 2546, 2555, 115 L. Ed. 2d 640, 657 (1991).

To properly satisfy the exhaustion requirement, the petitioner must provide the state court with the first opportunity to hear the same claim raised in the federal habeas petition. <u>Picard v. Connor</u>, 404 U.S. 270, 276, 92 S. Ct. 509, 512, 30 L. Ed. 2d 438, 444 (1971). The petitioner must invoke "one complete round of the State's established appellate review process." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S. Ct. 1728, 1732, 144 L. Ed. 2d 1, 9 (1999). Once the issue has been raised on direct appeal, a petitioner is not required to raise it again in a state post-conviction proceeding. <u>Werts v. Vaughn</u>, 228 F.3d 178, 192 (3d Cir. 2000).

The claim must be "fairly presented" to the state courts, which means the petitioner must "present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." <u>McCandless v. Vaughn</u>, 172 F.3d 255, 261 (3d Cir. 1999). "It is not enough that all the facts necessary to support the federal claim were before the state courts...." <u>Anderson v. Harless</u>, 459 U.S. 4, 6, 103 S. Ct. 276, 277, 74 L. Ed. 2d 3, 7 (1982). The "mere similarity of claims is insufficient to exhaust." <u>Keller v. Larkins</u>, 251

F.3d 408, 413-414 (3d Cir. 2001) (quoting <u>Duncan v. Henry</u>, 513 U.S. 364, 366, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865, 868 (1995)).

However, petitioner is not required to cite "book and verse" to the federal Constitution in his state-law claim. <u>Picard</u>, 404 U.S. at 278, 92 S. Ct. at 513, 30 L. Ed. 2d at 445 (internal quotation omitted). The United States Court of Appeals for the Third Circuit has provided four ways in which petitioners can fairly present a federal claim to state courts without explicitly referencing the federal Constitution or federal laws:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

<u>McCandless</u>, 172 F.3d at 261 (internal quotation omitted).

### B.     Procedural Default and the Relaxed Waiver Rule.

A claim may be deemed exhausted although it has not been fairly presented to state courts if no state corrective processes are available, or if circumstances exist that render such processes ineffective to protect the rights of the petitioner. 28 U.S.C. §§ 2254(b)(1)(B)(i), (ii); <u>Szuchon v. Lehman</u>, 273 F.3d 299, 323 n.14 (3d Cir. 2001); <u>McCandless</u>, 172 F.3d at 260.

However, where a claim is unexhausted because of petitioner's failure to comply with a state procedural rule, such claims are considered procedurally defaulted. <u>Werts</u>, 228 F.3d at 192 & n.9. A federal habeas court "will not review a question of federal law decided by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment." <u>Jacobs v. Horn</u>, 395 F.3d 92, 117 (3d Cir. 2005) (internal quotations omitted); <u>see also</u> <u>Bronshtein v. Horn</u>, 404 F.3d 700, 707 (3d Cir. 2005).

A state court decision rests on "independent" state grounds when "resolution of the state procedural law question" does not depend on a "federal constitutional ruling." <u>Laird v. Horn</u>, 159 F. Supp. 2d 58, 73 (E.D.Pa. 2001)(internal quotations omitted), <u>aff'd</u>, 414 F.3d 419 (3d Cir. 2005).

For a state rule to provide an "adequate" basis for precluding federal review of a state prisoner's habeas claim, the rule must have been firmly established and regularly followed at the time the alleged default occurred. <u>Albrecht v. Horn</u>, 485 F.3d 103, 115 (3d Cir. 2007). This requirement ensures that petitioner had fair notice of the need to follow the state procedural rule before barring habeas review. <u>Bronshtein</u>, 404 F.3d at 707.

A state procedural rule is considered "adequate" when it has the following attributes: "(1) the state procedural rule speaks in unmistakable terms; (2) all state appellate courts refused to review the petitioner's claims on the merits; and (3) the state courts' refusal in this instance is consistent with other decisions." <u>Jacobs</u>, 395 F.3d at 117.

In this case, the Supreme Court of Pennsylvania held that certain claims raised by petitioner on PCRA appeal[40] were waived for petitioner's failure to raise them on direct appeal.

---

[40] The Supreme Court of Pennsylvania held that the following claims were waived for failure to raise them on direct appeal:

> (1) The Commonwealth used its Peremptory strikes to discriminate against women, African-Americans and persons of Jewish ancestry; (2) The trial court improperly excluded prospective jurors in violation of Appellant's rights to an impartial jury and fair trial; (3) The prosecutor committed misconduct by introducing improper evidence at the guilt phase and making improper closing arguments in violation of Appellant's right to a fair trial; (4) Appellant's rights were violated at the guilt phase of his trial and both penalty phase proceedings when the trial court gave a reasonable doubt instruction to the jury; (5) Appellant's rights were violated by the trial court's erroneous lessening of the burden of proof on the element of corpus delicti; (6) The trial court's instructions after the jury reported a deadlock impermissibly suggested the verdict favored by the court and coerced the jury to return a death verdict with respect to the counts on which they were deadlocked; (7) Appellant is entitled to relief from his death sentence because the penalty phase jury instructions and verdict sheet unconstitutionally indicated that the jury had to unanimously find any mitigating circumstance before it could give effect to that circumstance in its

Respondents contend that the Supreme Court of Pennsylvania's waiver renders many of petitioner's claims for habeas relief procedurally defaulted. Petitioner argues that the procedural default is not supported by adequate state-law grounds because the waiver rule had not been firmly established and regularly followed at the time petitioner took his direct appeal.

For capital cases, the Supreme Court of Pennsylvania established the practice of applying a relaxed waiver rule because of the "final and irrevocable nature of the death penalty." Commonwealth v. Zettlemoyer, 500 Pa. 16, 50 n.19, 454 A.2d 937, 955 n.19 (1982). Accordingly, the Supreme Court of Pennsylvania would not adhere strictly to the normal rules of

<hr>

sentencing decision; (8) Appellant was sentenced to death on the basis of an aggravating factor-the witness elimination aggravating factor-that violated due process and the ex post facto clause and failed to channel the sentencer's discretion; (9) Appellant is entitled to relief from his death sentences because of the prosecutor's improper closing argument at the initial penalty phase hearing; (10) The trial court deprived Appellant of a fair and reliable capital sentencing proceeding when it instructed the jury at both penalty trials that it could not consider sympathy in reaching its verdict; (11) Appellant's death sentence must be vacated because the sentencing jury was never instructed that, if sentenced to life, Appellant would be statutorily ineligible for parole; (12) Appellant's death sentence must be vacated because one of the jurors failed to inform the court during voir dire that she had been the victim of crimes of violence and had close relatives who were convicted of murder; (13) The admission of extensive and inflammatory evidence regarding the murders of the two women at the penalty phase retrial, and the prosecutor's repeated references to the details of those murders, deprived Appellant of a fair sentencing proceeding; (14) Appellant is entitled to relief from his death sentence because of the prosecutor's improper closing argument at the penalty phase retrial; (15) The trial court's conduct towards the jury at the second penalty hearing amounted to a directed verdict in favor of the Commonwealth and constituted impermissible comment on Appellant's decision not to testify.

Marshall III, 812 A.2d 539, 543-544.

The above claims constitute the following claims raised in the instant Section 2254 Petition: Claim VI (Claim 1 above), Claim VII (Claim 2 above), Claim VIII (Claim 3 above), Claim XII (Claim 6 above), Claim I (Claim 7 above), Claim XI (Claim 8 above), Claim IX (Claim 9 above), Claim X (Claim 11 above), Claim XVI (Claim 12 above), Claim XIX (Claim 13 above), Claim XX (Claim 14 above), and Claim XXII (Claim 15 above). Claims 4, 5, and 10 above were not raised again in the instant matter. However, as noted earlier, all claims relating petitioner's death sentences are now moot. Accordingly, Claims I, IX, X, XI, XII, XVI, XIX, XX and XXII are not relevant to my discussion herein because they all relate to petitioner's death sentence. The only claims where there is a potential waiver because they were not raised on direct appeal are Claims VI, VII and VIII. I discuss this later in this Opinion.

waiver and would consider the merits of claims otherwise waived for failure to properly preserve

for appellate review. Id.; see also Szuchon, 273 F.3d at 325-326.

Petitioner was not fairly on notice that the ordinary waiver rule would apply to his capital

case on his direct appeals, the first of which was decided in 1989 and the second of which was

decided in 1994, because the Pennsylvania courts did not have a firmly established and regularly

followed rule enforcing waiver. See Marshall I, 568 A.2d 590; Marshall II, 643 A.2d 1070.

Therefore, as the United States Court of Appeals for the Third Circuit has held, the holding that a

claim has been waived for petitioner's failure to raise it on direct appeal in a capital case is not

"adequate" to support the judgment for purposes of procedural default. Szuchon, 273 F.3d at

327.

On November 23, 1998 the Supreme Court of Pennsylvania held that the relaxed waiver

rule would no longer apply to capital cases at the post-conviction appellate stage.

Commonwealth v. Albrecht, 554 Pa. 31, 44, 720 A.2d 693, 700 (1998). The Court held that "the

negligible benefits of relaxed waiver at the PCRA appellate stage are more than outweighed by

the need for finality and efficient use of the resources of this court." 554 Pa. at 45, 720 A.2d at

700.

Following Albrecht, the Supreme Court of Pennsylvania "deems an issue waived where

the petitioner failed to present it to the PCRA court." Jacobs, 395 F.3d at 117. Accordingly, after

Albrecht the waiver rule would be considered an "adequate" state-law ground for procedural

default purposes on habeas review because a petitioner would have fair notice of its application

in capital cases.[41]

---

[41]   The Third Circuit has not explicitly held when the waiver rule, as applied in capital cases on PCRA review, specifically became firmly established and regularly followed. Instead, the Third Circuit has only had occasion to

Here, the Pennsylvania Supreme Court ruled on petitioner's first direct appeal on December 22, 1989, pre-<u>Albrecht</u>. <u>See</u> <u>Marshall I</u>, 568 A.2d 590. He was therefore not on notice that the relaxed waiver rule would not apply to his case. Accordingly, the waiver rule is not an "adequate" state court ground causing petitioner's claims to be procedurally defaulted.

Respondents contend that the waiver rule was an adequate state court ground because, rather than being inconsistently applied, it was a "discretionary" rule. However, respondents have cited no authority for the proposition that the waiver rule, as applied in capital cases, amounts to a "discretionary" rule which is an adequate state ground. By contrast, Third Circuit precedent establishes that the waiver rule was not an adequate state ground in capital cases during the existence of the relaxed waiver doctrine. <u>See</u> <u>Jacobs</u>, 395 F.3d 92, <u>Bronshtein</u>, 404 F.3d at 708-10; <u>Szuchon</u>, 273 F.3d at 326-27.

Respondents cite to numerous published and unpublished decisions of this court for the proposition that the waiver rule is an adequate state ground. Decisions of this court are insufficient to overcome the Third Circuit precedent noted above. Moreover, each of these cases is distinguishable for significant reasons. First, three of the cases cited by respondents are not capital cases. <u>See</u> <u>Williams v. Sauers</u>, 2015 WL 787275 (E.D.Pa. Feb. 25, 2015); <u>Smith v. Vaughn</u>, 1997 WL 338851 (E.D.Pa. June 17, 1997); and <u>Catanch v. Larkins</u>, 1999 WL 529036 (E.D.Pa. July 23, 1999). Thus, the relaxed waiver doctrine was not at issue in those cases.

Second, another case reasoned that the relaxed waiver doctrine was eradicated through amendments to the PCRA in 1995, and that the petitioner in that case therefore "could not have justifiably relied on the relaxed waiver doctrine as grounds for failing to timely raise his claims"

---

hold that the procedural rule could not have been firmly established and regularly followed before <u>Albrecht</u>. <u>See</u>, <u>e.g.</u>, <u>Bronshtein</u>, 404 F.3d at 709.

in a direct appeal after 1995. See Holloway v. Horn, 161 F. Supp. 2d 452, 475 (E.D.Pa. 2001),

reversed in part on other grounds by Holloway v. Horn, 355 F.3d 707 (3d Cir. 2004). However,

petitioner here filed his first direct appeal, the point at which it is alleged he waived certain

claims, many years prior to the 1995 amendments.

Following respondents logic, there would be no distinction between "discretionary" rules

and those rules which are simply inconsistently applied. Every inconsistently applied rule would

be converted into a discretionary rule. This is, however, an important distinction because the

purpose of requiring state law to be regularly-followed in order to be "adequate" to bar federal

review is to ensure that petitioner had notice of the state law ground before forfeiting his right to

pursue a claim.  Bronshtein, 404 F.3d at 707.

Discretionary rules still allow for notice because "judicial discretion is the exercise of

judgment according to standards that, at least over time, can become known and understood

within reasonable operating limits." Morales v. Calderon, 85 F.3d 1387, 1392 (9th Cir. 1996). In

this case, respondents have not pointed to any set of factors forming an understandable standard

regarding when the relaxed waiver doctrine would be invoked. Accordingly, the waiver rule is

insufficient to support a procedural default of petitioner's Claims VI, VII and VIII.

**C.      Previously-Litigated Bar.**

The Pennsylvania Supreme Court also upheld the PCRA court's refusal to hold an

evidentiary hearing to address the merits of one of petitioner's other claims--that his "trial

counsel was ineffective for failing to investigate and present evidence that [petitioner's] mental

impairments, in conjunction with the conduct of the police, rendered his confession involuntary."

Marshall III, 812 A.2d at 544.

The court held that this ineffectiveness claim was not reviewable because it had been previously litigated. Id. (citing 42 Pa.C.S.A. § 9543(a)(3)). It categorized the claim as "a veiled attempt to relitigate the same suppression issue that [petitioner] previously raised on his direct appeal". Id.

The Third Circuit held that the previously-litigated bar to PCRA review is not an "independent" state law ground which would bar federal review. See Boyd v. Waymart, 579 F.3d 330, 368-69 (3d Cir. 2009). The Commonwealth concedes that the previously-litigated bar no longer operates to bar federal review. Accordingly, the entirety of petitioner's Claim III is reviewable.

### D. Cause and Prejudice.

Petitioner has raised several claims which are procedurally defaulted because he failed to raise them in state court and the time for doing so has elapsed.

A federal court may still consider the merits of petitioner's procedurally defaulted claim if a petitioner can establish cause and prejudice for his failure to comply with the state procedural rule, or that a fundamental miscarriage of justice would result, requiring excusal of the procedural default. Carpenter v. Vaughn, 296 F.3d 138, 146 (3d Cir. 2002).

A fundamental miscarriage of justice can be established only in extraordinary cases, and "petitioner must prove that it is more likely than not that no reasonable juror would have convicted him." Werts, 228 F.3d at 193.

"Cause" for procedural default can be established where some objective factor external to the defense impeded counsel's efforts to comply with the state procedural rule. Id. The United States Supreme Court has held that ineffective assistance of counsel pursuant to the Sixth

Amendment can constitute cause for procedural default. <u>Murray v. Carrier</u>, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397, 409 (1986).

A petitioner can establish the "prejudice" requirement by showing that the alleged error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." <u>Werts</u>, 228 F.3d at 193 (internal quotations omitted). Where ineffective assistance of counsel is the alleged "cause," prejudice occurs "where there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different." <u>Werts</u>, 228 F.3d at 193 (internal quotations omitted).

The United States Supreme Court has held that there is no constitutional right to an attorney in state post-conviction proceedings. <u>Coleman v. Thompson</u>, 501 U.S. 722, 752, 111 S. Ct. 2546, 2566, 115 L. Ed. 2d 640, 671 (1991). Consequently, a petitioner cannot make a Sixth Amendment claim for ineffective assistance of post-conviction counsel. <u>Id.</u> In <u>Coleman</u>, the United States Supreme Court explained that procedural default resulting from constitutionally ineffective assistance of counsel is an external factor that is imputed to the state because of the state's responsibility to provide competent counsel pursuant to the Sixth Amendment. <u>Id.</u> However, "[i]n the absence of a constitutional violation, the petitioner bears the risk in federal habeas for all attorney errors made in the course of the representation...." 501 U.S. at 754, 111 S. Ct. at 2567, 115 L. Ed. 2d at 672.

However, the United States Supreme Court has created a narrow exception to the rule set forth in <u>Coleman</u>. In <u>Martinez v. Ryan</u>, 566 U.S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012) the Supreme Court held that a prisoner may establish cause for the procedural default of an ineffective-assistance-of-trial-counsel claim by demonstrating the ineffectiveness of counsel in an "initial-review collateral proceeding". The Supreme Court defined "initial-review collateral

proceeding" as a collateral proceeding that "provide[s] the first occasion to raise a claim of ineffective assistance at trial." 566 U.S. at 8, 132 S. Ct. at 1315, 182 L. Ed. 2d at 282.

Accordingly, while petitioner did not have a constitutional right to PCRA counsel, the alleged ineffectiveness of PCRA counsel may constitute cause for petitioner's procedural default of a claim of ineffectiveness of trial counsel. Martinez, supra.

The only claim that petitioner presents which would potentially fall into the Martinez exception is Claim XXXII:

> PCRA Counsel Was Ineffective for Failing to Raise Several Errors and Failure Committed by Trial Counsel that Undermined the Truth Determining Process, Deprives the Proceedings of the Reliability and Accuracy Demanded by the United States Constitution and, Had the Evidence Been Presented, There is a Reasonable Probability that the Result of the Proceedings Would Have Been Different.

This is petitioner's only claim where he asserts that PCRA counsel was ineffective for failing to raise the ineffectiveness of trial counsel. However, in Claim XXXII, petitioner also argues that PCRA counsel was ineffective for failing to assert the ineffectiveness of direct appeal counsel. That portion of Claim XXXII will not establish cause for default because the Martinez exception does not apply to PCRA counsel's failure to address the ineffectiveness of direct appeal counsel. See Davila v. Davis, __ U.S. __, 137 S. Ct. 2058, 198 L. Ed. 2d 603 (2017).

Petitioner also raises an additional claim of PCRA counsel's alleged ineffectiveness in Claim XXXIII: "PCRA Counsel Was Ineffective Because He Abandoned Petitioner and Allowed Attorneys from the FDCO to Handle the PCRA Proceedings". Because this claim does not involve the failure to raise trial counsel ineffectiveness, it does not fall within Martinez's narrow exception to Coleman. See Davila, supra. It is therefore not reviewable. However, as noted

below, Claims XXXII and XXXIII are time-barred, thus, it will be unnecessary to address the applicability of <u>Martinez</u> as cause to overcome procedural default.

      **E.**    **Grounds for Relief.**

          **1.**    **Claim III: Petitioner's Confession Was Involuntary; Trial Counsel Was Ineffective for Failing to Investigate and Present Evidence that Petitioner's Mental Impairments, in Addition to the Conduct of the Police, Rendered His Statement Involuntary.**

The Pennsylvania Supreme Court rejected the ineffectiveness portion of this claim as previously-litigated. However, as discussed above, an ineffectiveness claim is distinct from the underlying claim. <u>See</u> <u>Commonwealth v. Collins</u>, 888 A.2d 564 (Pa. 2005). Accordingly, the entirety of this claim has been exhausted and is now reviewable.

To demonstrate ineffectiveness of counsel, petitioner must demonstrate: (1) "that counsel's performance was deficient"; and (2) "that the deficient performance prejudiced the defense." <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). The deficiency must consist of "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u> Furthermore, to establish prejudice, petitioner must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u>

Petitioner's underlying claim that his confession was involuntary lacks merit, and therefore his trial counsel was not ineffective for failing to investigate it further. "[T]actics for eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness." <u>Miller v. Fenton</u>, 474 U.S. 104, 110, 106 S. Ct. 445, 449, 88 L. Ed. 2d 405 (1985).

Petitioner claims, and cites evidence for the proposition, that there was a pattern or practice of police brutality within the Philadelphia Police Department during the general time

frame of petitioner's confession. Even if true, it would have been impermissible for the trial court to assume that petitioner in particular had probably been physically coerced into confessing based solely on that alleged pattern or practice.

Petitioner's suggestion that his attorney may have uncovered more evidence to support his claim that he, personally, was physically coerced is entirely speculative. There was no evidence to support a suspicion that petitioner was physically coerced, such as physical injuries. His trial attorney was not ineffective for failing to investigate further.

Moreover, the Pennsylvania Supreme Court correctly concluded that the fact that petitioner was shown photographs of the victims was insufficient to amount to emotional coercion. The Pennsylvania Supreme Court has, in other cases, found the same tactics insufficient to amount to coercion. See, e.g., Commonwealth v. Fahy, 516 A.2d 689 (Pa. 1986).[42]

Furthermore, the police officers who questioned petitioner testified that showing him the photographs did not appear to have a coercive effect on him; rather, he was alert and responsive. See Marshall II, 568 A.2d at 595. The officers also testified that petitioner's confession was not triggered by the photographs. Instead, he "decided to make his confession after he was shown his brother's statement in which he told his brother that he had killed the women." Id.

Under the AEDPA's deferential standard of review, a state court's factual findings are "presumed to be correct," and the habeas corpus petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Bond v. Beard, 539 F.3d 256, 263 (3d Cir. 2008). Accordingly, I must give deference to the state

---

[42] The defendant in Fahy further alleged that, while being questioned, "he experienced fatigue and the effects of his seizure and depression medication." Fahy, 516 A.2d at 695. Those alleged facts, combined with being shown a photograph of the victim, still did not render his statement involuntary.

court's credibility determinations regarding petitioner and the officers who testified at the suppression hearing. Petitioner has failed to rebut these findings.

Petitioner also alleges that his trial counsel was ineffective for failing to present mental health evidence in support of his suppression motion. However, the record reflects that petitioner refused to be evaluated by a mental health professional. See Marshall III, 812 A.2d at 548 & 548 n.9. Petitioner's counsel cannot be faulted for failing to present evidence that petitioner himself rendered unavailable.

Furthermore, petitioner has still not provided any mental health evaluations which support his claim that his confession was involuntary. Rather, no later evaluation to which he submitted ever specifically addressed the voluntariness of his confession.

Petitioner has been evaluated by four medical professionals, court psychologist Jules deCruz, M.S.; neuropsychologist Carol Armstrong, Ph.D., clinical psychologist Jethro Toomer, Ph.D.; and clinical psychologist Kirk Heilbrun, Ph.D. Mr. deCruz found petitioner competent, less than a year from his confession to police.[43] Dr. Armstrong opines that petitioner suffers from neurocognitive deficits that make him more vulnerable and less able to deal with stressful situations.[44] Dr. Toomer states that petitioner can become psychotic in stressful situations,[45] suffers from cognitive and emotional impairments as a result of organic brain damage,[46] and was psychotic at the time of the killings.[47] Dr. Heilbrun opined that at the time of the offense

---

[43]     Respondent's Exhibit 13, p. 5.

[44]     Petitioner's Exhibit 5, p. 1.

[45]     Petitioner's Exhibit 6, at ¶ 20.

[46]     Id. at ¶ 17.

[47]     Id. at ¶ 22.

petitioner suffered from a mental or emotional disturbance and his capacity to conform his conduct to the requirements of law was impaired.[48]

None of the four mental health professionals opined on petitioner's mental condition at the time of his confession, over nine months after the deaths of Sharon Saunders, Karima Saunders, and Myndie McKoy. One was conducted a year after the confession and the other three were conducted nearly fourteen years later. These evaluations are underwhelming to say the least concerning the issue of the voluntariness of petitioner's confession to police.

Upon review, I cannot conclude that the state court's conclusion that petitioner's confession was voluntary, and that his suppression motion was properly denied, was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). Moreover, I cannot conclude that petitioner's counsel was ineffective for failing to investigate further to support this meritless claim, especially in light of petitioner's unwillingness to cooperate with any such mental evaluation prior to trial. Accordingly Claim III is denied.

>    2.    **Claim IV: The Trial Testimony of the Medical Examiner, Dr. Aronson, Was False and Misleading, and Trial Counsel Was Ineffective for Failing to Impeach Him.**

On PCRA review, the Pennsylvania Supreme Court found the underlying substantive prosecutorial misconduct portion of this claim waived when petitioner failed to raise it on direct appeal. See Marshall III, 812 A.2d at 550 n.2. However, in light of the relaxed waiver doctrine which applied in capital cases in Pennsylvania at the time petitioner filed his direct appeal, the

---

[48]    Petitioner's Exhibit 8, at ¶ 25.

waiver rule does not constitute an "adequate" state law ground which would prevent federal review.

Deferential review under the AEDPA applies to this claim because, although the Pennsylvania Supreme Court found that this claim had been waived, it nevertheless reviewed its merits. See Marshall III, 812 A.2d at 549-50; see also Rolan v. Coleman, 680 F.3d 311, 321 (3d Cir. 2012) (noting that the "AEDPA draws no such distinction for alternative rulings").

The state court's conclusion that the testimony of the medical examiner, Dr. Aronson, was not misleading or deceptive is not "contrary to" or an "unreasonable application" of federal law. Moreover, because Dr. Aronson's testimony was not false or misleading, petitioner's attorney was not ineffective for failing to impeach him.

Petitioner asserts that Dr. Aronson's testimony at trial was false or misleading because he testified that he could not rule out drowning as a cause of death for Myndie McKoy and Karima Saunders, but later testified at petitioner's second penalty phase hearing that he could rule out drowning as a cause of death.

The Supreme Court of Pennsylvania reviewed petitioner's claim and stated as follows:

> Next, [petitioner] claims that the PCRA court erred by denying his petition without first holding an evidentiary hearing regarding his claim that the trial testimony of the medical examiner, Dr. Aronson, was misleading, and therefore, his trial counsel was ineffective for failing to impeach him. This claim fails.
>
> At [petitioner's] trial, Dr. Aronson testified that the cause of Myndi McKoy's and Karima Saunders deaths was ligature strangulation, but that he could not exclude drowning as a contributing cause to their deaths. (N.T., 8/3/84, 23-24, 28, 57-58.) [Petitioner] contends that his trial counsel should have impeached Dr. Aronson's testimony that he could not exclude drowning as a contributing cause of the deaths because such testimony was misleading and/or deceptive. In support of his contention, [petitioner] points to a specific portion of Dr. Aronson's testimony

at his 1990 penalty phase rehearing. However, this testimony from the 1990 penalty phase rehearing clearly indicates that Dr. Aronson's testimony was fully consistent with his prior testimony at [petitioner's] trial that he could not exclude drowning as a contributing cause to the deaths of Myndi McKoy and Karima Saunders. In response to questioning by [petitioner's] counsel, Dr. Aronson testified as follows at the 1990 penalty phase rehearing:

> Q: Now, there has been some discussion here about whether you could eliminate drowning as a cause of death, and you said you could not. On the other hand, you have said that with regard to two of these people, Myndi McKoy and Sharon Karima Saunders, that you can eliminate drowning as the cause of death but you cannot eliminate it as contributing, I wonder if you can clarify that.

> A: Let me clarify, I think you misspoke in your question about cause. I cannot eliminate in any of these cases that drowning was some factor somewhere along the line. I can eliminate in all three that it was a cause of death, because of the discoloration of the mucous membrane, indicating that the person was alive at the time the pressure was put on their neck.

(N.T., 7/25/90, at 83.)

In his brief to this Court, [petitioner] carefully quotes only Dr. Aronson's statement that he could not eliminate drowning as the cause of all three deaths, and argues that Dr. Aronson's testimony establishes that he lied to the jury at [petitioner's] trial when he testified that he could not exclude drowning as a contributing cause to Myndi McKoy's and Karima Saunders deaths. However, by removing Dr. Aronson's statement from the context in which it was made, it is actually [petitioner's] argument that is misleading. Dr. Aronson's response to counsel's request for clarification, taken as a whole, indicates that although he could not exclude drowning as a contributing factor to the deaths of Myndi McKoy and Karima Saunders, he was certain that ligature strangulation was the actual cause of their deaths. His testimony is therefore entirely consistent with his prior testimony at [petitioner's] trial that ligature strangulation was the cause of Myndi McKoy's and Karima Saunder's deaths, but that drowning could not be excluded as a contributing cause of their deaths. Since Dr. Aronson's trial testimony was neither deceptive nor

> misleading, [petitioner's] instant ineffectiveness claim necessarily
> fails.[49]

Marshall III, 812 A.2d at 549-50.

It was entirely reasonable for the state court to conclude that Petitioner's claim of ineffective assistance of counsel was without merit. Johnson v. Tennis, 549 F.3d 296, 301 (3d Cir. 2008). As stated by the Superior Court of Pennsylvania, the misleading aspect of this claim is not Dr. Aronson's testimony, it is petitioner's argument about it. There is no evidence of trial counsel's ineffectiveness for failing to properly impeach Dr. Aronson. Hence, the doubly deferential AEDPA standard dooms Petitioner's ineffectiveness claim. See Harrington v. Richer, 562 U.S. 86, 105, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) (explaining that applying the AEDPA standard to a *Strickland* claim requires the habeas court to apply double deference because each standard it itself "highly deferential").

Finally, there is not a scintilla of evidence of prosecutorial misconduct. The Supreme Court's determination that the prosecutorial misconduct aspect of this claim also falls because of the false premise supporting it was not "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (1)-(2). Therefore, under the deference that must be afforded under the AEDPA standard, Claim IV is denied.

---

[49]     [Petitioner's] instant claim for relief is fashioned both as a prosecutorial misconduct claim and an ineffective assistance of counsel claim. To the extent that [petitioner] claims that the Commonwealth's presentation of Dr. Aronson's testimony constituted prosecutorial misconduct, said claim is waived, since [petitioner] could have but did not raise the claim in his direct appeal to this Court. 42 Pa. C.S. § 9544(b). assuming arguendo that [petitioner] did not waive his prosecutorial misconduct claim for purposes of the PCRA by failing to raise it in his direct appeal, we would nevertheless find the claim to be without merit, since it too would be based on the false premise that Dr. Aronson's trial testimony was misleading and/or deceptive.

### 3. Claim V: Trial Counsel Was Ineffective at the Guilt Stage of Trial for Failing to Investigate, Develop and Present a Diminished Capacity Defense.

The Pennsylvania Supreme Court's conclusion that trial counsel was not ineffective for failing to present a diminished capacity defense was not "contrary to" or an "unreasonable application" of federal law. As the Court noted, petitioner adamantly maintained his innocence, going so far as to testify at his sentencing hearing that he was innocent. Presenting a diminished capacity defense would have been inappropriate in light of petitioner's claims of innocence because it is a directly contrary claim. One cannot be guilty, yet not culpable by reason of diminished capacity, and be innocent at the same time. See Commonwealth v. Cross, 634 A.2d 173, 175 (Pa. 1993). It was therefore a reasonable tactical decision on the part of petitioner's attorney not to pursue this defense and, thus, counsel was not ineffective. Accordingly Claim V is denied.

### 4. Claim VI: Petitioner is Entitled to Relief from His Conviction and Sentence Because the Commonwealth Discriminated Against African-American and Female Venirepersons in its Exercise of Peremptory Jury Challenges.

#### (a) Petitioner Forfeited His *Batson* Claim.

At the outset, this claim fails because petitioner forfeited it by failing to make a contemporaneous objection during jury selection regarding the prosecutor's use of peremptory challenges. The Third Circuit has ruled that "the existence of a timely objection to the use of peremptory strikes is not merely a matter of state procedural law; instead, 'a timely objection is required to preserve' a claimed Batson violation for appeal and failing to do so will result in forfeiture of the claim." Lewis v. Horn, 581 F.3d 92, 102 (3d Cir. 2009) (quoting Abu-Jamal v. Horn, 520 F.3d 272, 284 (3d Cir. 2008), certiorari granted and judgment vacated on other grounds by Beard v. Abu-Jamal, 558 U.S. 1142, 130 S. Ct. 1134, 175 L. Ed. 2d 967 (2010)); see

also Lark v. Secretary Pennsylvania Department of Corrections, 645 F.3d 596 (3d Cir. 2011) ("We have held that, even in trials before the Supreme Court's decision in Batson, a timely objection to the prosecutor's exercise of peremptory strikes is a prerequisite to raising a Batson claim on appeal.") (citing Lewis, 581 F.3d at 102).

Although Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), was not decided until after petitioner's trial and during the pendency of his first direct appeal, he could have raised a challenge under Batson's antecedent, Swain v. Alabama, 380 U.S. 202, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965), which was in effect at the time of petitioner's trial. See Lewis v. Horn, 581 F.3d at 101-02 ("Although Batson was not decided until after Lewis's trial and during the pendency of his direct appeal, Lewis did not make any objections to the prosecutor's use of peremptory challenges under the then-prevailing standard of Swain .... As the Supreme Court explained, an objection to the jury selection process under Swain 'necessarily state an equal protection violation subject to proof under the Batson standard'".) (quoting Ford v. Georgia, 498 U.S. 411, 420, 111 S. Ct. 850, 112 L. Ed. 2d 935 (1991)). Accordingly, this claim is forfeited. Clausell v. Sherrer, 594 F.3d 191, 194-95 (3d Cir. 2010).

**(b)** **Petitioner Has Failed to Make Out a Prima Facie Case Under** ***Batson/J.E.B.***

Even assuming petitioner had not forfeited this claim, he has failed to state a prima facie case. Because he has failed to establish a prima facie case, no evidentiary hearing is warranted. See Williams v. Beard, 637 F.3d 195, 211 (3d Cir. 2011).

Batson laid out a three-step burden-shifting framework:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light

-31-

of the parties' submissions, the trial court must determine whether
the defendant has shown purposeful discrimination.

<u>Miller-El v. Cockrell</u>, 537 U.S. 322, 328-29, 123 S. Ct. 1029, 1035, 154 L. Ed. 2d 931 (2003)

(citing <u>Batson</u>, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69) (internal citations omitted).

This framework is difficult to apply in cases such as this where no contemporaneous

objection was made during voir dire. As the Third Circuit explained:

> Application of Batson's three-part burden-shifting framework
> requires attention by the trial judge to actions taken *during jury
> selection* in the case at hand. To determine whether the prosecutor
> excluded jurors on the basis of race, the procedure established in
> <u>Batson</u> relies on trial judges to consider 'all relevant
> circumstances' *as they occur* in the case before it. ... A Batson
> claim requires a fact-intensive inquiry into the prosecutor's use of
> peremptory challenges. A timely objection gives the trial judge an
> opportunity to promptly consider alleged misconduct during jury
> selection and develop a complete record.

<u>Abu-Jamal</u>, 520 F.3d at 282 (emphasis added). Indeed, "[t]he <u>Batson</u> standard for assessing a

prima facie showing is fluid, *mainly because it places great confidence in the ability of trial

judges to assess whether discrimination is at work based on the evidence at hand*." <u>Holloway v.

Horn</u>, 355 F.3d 707, 728 (3d Cir. 2004)(emphasis added).

Moreover, the Third Circuit has noted that it would be extremely difficult for a

prosecutor, many years later, to "accurately recall his reasons for the strikes or provide

meaningful elaboration upon the reasons that he placed on the voir dire record." <u>Holloway</u>, 355

F.3d at 725. Therefore, it is difficult to establish or assess a prima facie case where the trial court

was deprived of the opportunity to consider an objection or create a record, and the <u>Batson</u>

burden-shifting framework is strained where a prosecutor is deprived of the opportunity to

provide contemporaneous reasons for his peremptory strikes. Nonetheless, employing the <u>Batson</u>

framework, petitioner has failed to establish a prima facie case which would shift the burden to the Commonwealth to justify its use of peremptory strikes.

### (c) Racial Strikes at the Trial and First Penalty Phase Hearing.

Petitioner alleges that he has established a prima facie case under Batson with respect to his trial and first penalty phase hearing based on the prosecutor's strike rates for African Americans and whites. Petitioner provides numbers for how many African American and white individuals were available to be struck by the prosecutor, and how many were indeed struck.

However, it is unclear where petitioner obtained this information, which makes it impossible to discern its accuracy. The Commonwealth contends that there is no complete record of the races of all venirepersons against whom peremptory challenges were brought.[50] Furthermore, the numbers petitioner provides are different in different places within his submissions. In his Amended Petition, he asserts that the prosecutor used seven strikes to remove seven of thirteen available African Americans, and seven strikes to remove seven of twenty-five available white venirepersons.[51] In his Memorandum of Law, however, he alleges that the prosecutor used six peremptory strikes to remove six of thirteen available African American venirepersons and seven strikes to remove seven of twenty-four whites.[52] The Commonwealth provides yet another different set of figures.[53]

---

[50] See Original Commonwealth Brief at page 123 n.55.

[51] See Amended Petition at ¶¶ 104, 105.

[52] See Memorandum of Law at pages 54-55.

[53] See Original Commonwealth Brief at page 124. The Commonwealth asserts that the prosecutor's notes indicate that the prosecutor struck six of sixteen available African Americans (a strike rate of 37.5%), and six out of twenty-five available white venirepersons (a strike rate of 24%).

Putting aside the issue of where petitioner obtained his information and whether or not it is admissible here, and giving him the benefit of the doubt by using the numbers that are more beneficial to his claim,[54] he has still failed to establish a prima facie case under Batson.

The Third Circuit has explained that petitioner's "burden at the initial stage is to show merely that jurors of his race have been struck and that the strikes are indicative of an improper motive." Holloway, 355 F.3d at 728. Nonetheless, peremptory challenges are presumed valid. Williams v. Beard, 637 F.3d 195, 214 (3d Cir. 2011) (citing United States v. DeJesus, 347 F.3d 500, 505 (3d Cir. 2003)).

In demonstrating an improper motive, relevant factors often include: "1) the number of racial group members in the panel; 2) the nature of the crime; 3) the race of the defendant; 4) a pattern of strikes against racial group members; and 5) the questions and statements during the voir dire." Id. at 721 (citing United States v. Clemons, 843 F.2d 741, 748 (3d Cir. 1998).

Petitioner appears to rely solely on the fourth factor outlined above--an alleged pattern of strikes against racial group members. However, his allegations in this regard are insufficient to establish a prima facie case. The Third Circuit has held that there is no "per se" rule regarding the number of potential jurors that must be struck to establish a pattern of discriminatory strikes. See Clemons, 843 F.2d at 746 ("[W]e find that establishing some magic number or percentage to trigger a Batson inquiry would short-circuit the fact-specific determination expressly reserved for trial judges."). Nonetheless, when compared with other cases, the facts alleged by petitioner are insufficient to suggest an improper motive.

For example, in Lewis v. Horn, 581 F.3d 92 (3d Cir. 2009), the Third Circuit found no Batson violation where a prosecutor allegedly struck eight African Americans and four whites,

---

[54] The numbers more beneficial to petitioner's claim are: seven strikes used against thirteen available African-Americans (a strike rate of 54%) and seven strikes used against twenty-five available whites (a strike rate of 28%).

even though the jury was ultimately composed of all white jurors. Those numbers are perhaps more indicative of an improper motive than here, where the prosecutor allegedly used equal strikes to remove non-African Americans as African Americans, and the ultimate jury was composed of six African Americans and six white jurors.

In Holloway, by contrast, the Third Circuit did find a Batson violation. However, in that case, the prosecutor exercised all but one (eleven out of twelve) peremptory strikes to remove African Americans, and the prosecutor provided contemporaneous explanations for his strikes that were ultimately found to be merely pretextual. In the present case, unlike in Holloway, the prosecutor's peremptory strikes were used equally to remove whites and African Americans (seven strikes for each). Moreover, there were no statements made by the prosecutor during voir dire that would indicate a racial animus or which petitioner claims were provided as a pretext for discrimination.

A case which falls more in between is Williams v. Beard, 637 F.3d 195 (3d Cir. 2011). In that case, the Third Circuit found that the petitioner had established a prima facie case based on the prosecutor's strike rate for African Americans compared to whites. Id. at 214. The prosecutor there exercised fourteen out of sixteen peremptory strikes to remove fourteen of nineteen African Americans available to be struck (a strike rate of 87.5%). Id. By contrast, the prosecutor exercised only two strikes to remove two out of twenty-one white venirepersons available to be struck (a strike rate of 12.5%). Id. Ultimately, however, the court found no Batson violation because the prosecutor offered race-neutral reasons for the strikes at an evidentiary hearing in state court. Id.

The Williams court noted that in other cases where petitioners were found to have made out a prima facie case, "the strike rate exceeded 85%", as compared to another case where no

prima facie case was made where the strike rate of African Americans was only 66.7%. Id. at 215 (citing Holloway, supra; Brinson v. Vaughn, 398 F.3d 255 (3d Cir. 2005); Hardcastle v. Horn, 368 F.3d 246 (3d Cir. 2004); and Abu-Jamal, 558 U.S. 1142, 130 S. Ct. 1134, 175 L. Ed. 2d 967).

In the present case, petitioner alleges that the prosecutor's strike rate for African Americans was 54% compared to a 28% strike rate for whites. While no per se rule exists regarding what numbers suffice to establish a prima facie case, an alleged 54% strike rate for African Americans falls well below the 85% strike rate noted by the Third Circuit as having existed in prior cases where a prima facie case had been established. See Williams, 637 F.3d at 215. Given the fact that petitioner is relying solely on these numbers to establish a prima facie case, he falls woefully short.[55]

Petitioner further points to a video tape utilized by the Philadelphia District Attorney's Office in the 1980s for the purpose of training new Assistant District Attorneys on how to conduct jury selection. This training video, prepared by former Assistant District Attorney Jack McMahon ("the McMahon tape"), was created in 1987, approximately three years after petitioner's trial. It is undisputed that the tape advocates the use of practices which would likely violate Batson.

It should be noted, however, that in addition to being created years after petitioner's trial, Mr. McMahon was not the prosecutor in his case. The Third Circuit has held, under similar circumstances, that the McMahon tape is insufficient to establish a prima facie Batson violation.

---

[55]     Petitioner also asserts that researchers who reviewed thirty-eight capital cases prosecuted by the prosecutor in his case, Roger King, found that he "struck black venirepersons 52% of the time he was able to do so" and "struck non-blacks only 24% of the time". Amended Petition at ¶ 118. These numbers are essentially comparable to the alleged numbers from petitioner's own case and thus fail for the same reasons. Furthermore, it is unclear whether it is appropriate to consider evidence from a small sample of only capital cases tried by Mr. King during an undisclosed period of time, and without knowing the race of the defendant in those cases.

See Lewis, 581 F.3d at 104 ("Although many of the practices advocated in the McMahon tape flout the principles outlined in Batson, the tape was created four years after Lewis's trial and fails to provide any information about the routine practices of the particular prosecutor in Lewis's case or the practices actually utilized at Lewis's trial.").

Petitioner also seeks to bolster his claim by pointing to an article published by the University of Pennsylvania's Journal of Constitutional Law authored by David C. Baldus and others. See Baldus, et al., The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis, 3 U. Pa. J. Const. L. 3 (2001). This article discusses, *inter alia*, discrimination in the use of peremptory challenges.

### (d) Gender Strikes at the Trial and First Penalty Phase Hearing.

Petitioner claims that the Commonwealth also executed peremptory strikes in a discriminatory manner to eliminate females at the 1984 jury selection in violation of J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994). In support of this claim, petitioner relies principally on the prosecutor's alleged strike rates for males and females. As with his Batson claim, petitioner's numbers are inconsistent within his various filings. In his Petition, he alleges that the prosecutor used eleven of fourteen peremptory strikes to remove eleven of twenty-two available female venirepersons (a strike rate of 50%), whereas the prosecutor used only three strikes to remove three of eighteen available men (a strike rate of 16.6%).[56]

However, in his Memorandum of Law, petitioner alleges that the prosecutor used ten (rather than eleven) of thirteen (rather than fourteen) strikes to remove women.[57] However,

---

[56]     See Amended Petition at ¶¶ 124, 125.

[57]     See Memorandum of Law at pages 54-55.

petitioner fails to provide a strike rate within the latter figures, nor is one calculable from the information provided, so I will utilize the more comprehensive figures provided in the Petition to analyze his claim. Petitioner cites to the prosecutor's notes from voir dire for the figures provided in his Memorandum of Law, but provides no source for the slightly different figures provided in his Amended Petition.

As discussed above with respect to petitioner's Batson claim, a strike rate of 50% is hardly enough to establish a prima facie case on its own. See Williams, 637 F.3d at 215. Petitioner has pointed to no statements made by the prosecutor during voir dire which would purportedly demonstrate a discriminatory motive.

The only additional evidence on which petitioner relies to support this claim is a "recent" study published by the Pennsylvania Supreme Court, which allegedly concludes that women are struck from juries at a higher rate than men in capital cases. It appears that the study which petitioner cites, "Pennsylvania Supreme Court Committee on Racial and Gender Bias in the Judicial System",[58] involved data collected in 2001, which was 17 years after petitioner's trial. It is unclear how this information is at all relevant to petitioner' case. Accordingly, petitioner has failed to establish a prima facie case of gender discrimination in jury selection at his 1984 trial.

**(e)      Racial Strikes at the Second Penalty Phase Hearing.**

Petitioner alleges that the prosecutor at his second penalty phase hearing again exercised peremptory strikes in a discriminatory manner. Because respondents have agreed to remove the

---

[58]      See Amended Petition at ¶ 127 n.23.  Petitioner also contends that the McMahon training tape demonstrates a gender bias in jury selection as well, but that tape is insufficient to establish a prima facie case for the reasons already articulated.

death penalty from this case, it is unnecessary to analyze any racial strikes at the second penalty phase hearing.

Therefore, for the reasons expressed above, petitioner's <u>Batson</u>/<u>J.E.B.</u> claim would be denied on the merits even if not forfeited. Because his underlying claim lacks merit, his former counsel were not ineffective for failing to pursue it. Accordingly, Claim VI is denied.

     **5.**     **Claim VII: The Trial Court Improperly Death-Qualified the Jury and Improperly Excluded Prospective Jurors in Violation of Mr. Marshall's Rights to an Impartial Jury and Fair Trial.**

Petitioner alleges that "the trial court improperly disqualified for cause three jurors who did not indicate that they would not follow the law as set forth by the trial court, and prematurely dismissed prospective jurors without adequate opportunity for defense counsel to respond."[59] Petitioner contends that this violated his right to an impartial jury that is not "uncommonly willing to condemn a man to die" in violation of the Sixth Amendment. <u>See</u> <u>Witherspoon v. Illinois</u>, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968).

The Pennsylvania Supreme Court found that this claim was waived, but the waiver rule is not an adequate state law ground which would bar federal review, as explained above. <u>See</u> <u>Marshall III</u>, 812 A.3d at 543. Nevertheless, the court need not address the merits of this claim because it has already set aside petitioner's death sentences. Any bias of the jury in favor of the death sentence is moot because the death sentences have been vacated. Accordingly, Claim VII is dismissed as moot.

---

[59]    Amended Petition at ¶ 132.

**6.**     **Claim VIII: The Prosecutor Committed Misconduct by Introducing Improper Evidence at the Guilt Phase and Making Improper Closing Arguments, in Violation of Petitioner's Right to a Fair Trial.**

Petitioner challenges several arguments made by the prosecutor during closing arguments, as well as the presentation of Myndie McKoy's mother as a witness and references made to victim suffering during the guilt phase. Petitioner asserts that these actions and statements by the prosecutor constitute misconduct. The Pennsylvania Supreme Court found that portions of this claim were waived, but the waiver bar is an inadequate state law ground as explained above. See Marshall III, 812 A.2d at 543. However, portions were addressed by the Supreme Court on direct appeal,[60] and by the trial court in its decision on petitioner's PCRA claims. Nonetheless, this claim fails on its merits on each individual sub issue and on any assertion of collective harm. Accordingly, former counsel was not ineffective for failing to pursue it.

Petitioner contends that the following constitute prosecutorial misconduct: (1) admission of evidence from the medical examiner regarding the amount of pain suffered by Myndi McKoy from the two stab wounds she received and the statements by the prosecutor about that painfulness in his guilt phase closing argument; (2) by presenting the testimony of Evangeline McKoy, Myndi McKoy's mother, and inviting an outburst by Mrs. McKoy in open court after asking to permit her to remain in the courtroom after her testimony; and (3) making improper comments during closing arguments by denigrating the role of defense counsel, impermissible appeals to passion or prejudice, vouching for the Commonwealth's case and improperly invoking religious authority. I will address each allegation individually.

---

[60]     See Marshall I, 568 A.2d at 596-98.

### (a) Improper Evidence and Closing Arguments on Victim Suffering.

Petitioner contends that the prosecutor improperly admitted evidence concerning the degree of pain Myndi McKoy experienced when petitioner stabbed her prior to strangling her. This evidence was admitted by the trial court over defense counsel's objection. Petitioner contends that there was no proper purpose for admission of this evidence and was completely irrelevant to any issue in the case. Thus, petitioner contends that he did not receive a fair trial. This portion of Claim VIII seems to infer that the trial court's admission of the evidence was improper and appeal counsel should have raised the issue on direct appeal.

The trial court addressed this in its PCRA decision as follows:[61]

> Dr. Aronson testified that the stab wound defendant inflicted on Myndi McKoy would be as painful as any stab wound. He also described the effects the wound would have on Ms. McKoy while she was still alive. [Petitioner] states that his appellate counsel should have argued that this testimony was inadmissible because it lacked probative value and was prejudicial. Contrary to [petitioner's] claims, this evidence did have probative value. It substantiated part of [petitioner's confession], it showed the force and methods defendant used to kill Ms. McKoy, and it showed defendant's intent to kill.

> [Petitioner] reasons that since this evidence was damaging to his case he is entitled to PCRA relief. The problem with [petitioner's] argument is that "all of the prosecution's evidence is intended to 'prejudice' the [defense], and simply because it is damaging to the defense is no reason to exclude the evidence." Commonwealth v. Rigler, 488 Pa. 441, 453, 412 A.2d 846, 852 (1980). In addition, the trial court is not "required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration…[.]" Commonwealth v. Wharton, 530 Pa. 127, 147, 607 A.2d 710, 720 (1992). Finally, defendant's assertion of prejudice without more is insufficient to warrant relief based on a theory of ineffective assistance of counsel. See Commonwealth v. Silo, 509 Pa. 406, 411, 502 A.2d 173, 176 (1985); Commonwealth

---

[61] See Respondent's Exhibit 7, Opinion of Glazier, J. at 20-21.

> v. Pettus, 492 Pa. 558. 563-564, 424 A.2d 1332, 1335 (1981). This
> evidence was properly admitted by the trial court, and as such,
> counsel was not ineffective for not challenging its admission on
> direct appeal.

"It is well established that evidentiary errors of state courts are not considered to be of

constitutional proportion, cognizable in federal habeas corpus proceedings, unless the error

deprives a defendant of fundamental fairness in his criminal trial." Bisaccia v. Attorney General

of the States of New Jersey, 623 F.2d 307, 312 (3d Cir. 1980). Dowling v. United States, 493

U.S. 342, 352-53, 110 S. Ct. 668, 674, 107 L. Ed. 2d 708, 720 (1990).

The admission of the evidence in this case did not deprive petitioner of the fundamental

fairness of his trial and provides no basis for federal habeas corpus relief. Contrary to petitioner's

assertions, the testimony regarding Myndi McKoy's injuries was relevant to numerous probative

issues including the extent, force and methods employed by petitioner against her. It

demonstrated petitioner's intent to kill, an element of first degree murder and substantiated a

portion of his confession, which he contested at trial.

There is no indication that admission of this testimony or that appeal counsel was

ineffective for failing to challenge its admission on direct appeal was "contrary to, or involved an

unreasonable application of, clearly established Federal law" or was "based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." 28

U.S.C. § 2254(d) (1)-(2). Thus, this portion of Claim VIII is denied.

Next, petitioner contends that the prosecutor "then reminded the jury of the pain suffered

by the victims in his guilt phase closing argument."[62] Petitioner cites to pages 43 and 51 of the

---

[62]    Amended Petition at ¶ 138.

trial transcript[63] for this proposition. Respondents contend that this claim is not supported by the citations to the record. I agree.

The two pages cited by petitioner refer to Myndi McKoy screaming (pgs. 43 and 51) and crying by Karima Saunders (pg. 51). These references are not in conjunction with any pain that these victims were experiencing, rather, it refers to aspects of petitioner's confession wherein he stated that he had to kill each of them because they were screaming (Myndi McKoy) or crying out for her mother (Karima Saunders). I find no misconduct by the prosecutor in stating in closing arguments information that was contained in petitioner's confession. Moreover, I find no ineffectiveness of prior counsel for failing to raise a meritless claim. Johnson, 549 F.3d at 301. Accordingly, this aspect of Claim VIII is denied.

### (b)  Misconduct Based on the Outburst by Evangeline McKoy.

On PCRA review, the Pennsylvania Supreme Court found the underlying substantive prosecutorial misconduct portion of this claim waived when petitioner failed to raise it on direct appeal. See Marshall III, 812 A.2d at 550 n.2. However, in light of the relaxed waiver doctrine which applied in capital cases in Pennsylvania at the time petitioner filed his direct appeal, the waiver rule does not constitute an "adequate" state law ground which would prevent federal review.

Petitioner contends that the prosecutor committed misconduct by presenting the testimony of Evangeline McKoy, the mother of Myndi McKoy, at the guilt stage of petitioner's trial. Petitioner asserts that although ample other evidence was presented to identify the body of Myndi McKoy, the prosecutor chose to present this evidence through her mother. Petitioner avers that the testimony of Evangeline McKoy was extremely inflammatory and emotional.

---

[63]    N.T. 8/24/84 at 43, 51.

Petitioner argues that this testimony was designed to create sympathy for the deceased and its sole purpose was to inflame the passions of the jury.

Furthermore, petitioner claims that Evangeline McKoy was removed from court after her testimony, and after the prosecutor requested that she be permitted to stay in the courtroom, because she interrupted the trial proceedings by yelling "Murderer, monster. I don't care. Monster. That's my only baby. I don't have no grandchildren or nothing. You didn't have to kill my baby. She wasn't bothering you. I knew she she was asleep." N.T. 8/24/84 page 91, lines 15, 17, 19-21. Petitioner contends that after her testimony, neither the prosecutor, nor the trial court gave her any instruction despite their knowledge that she had made outbursts at prior proceedings. Petitioner argues that with this prior notice, the prosecutor committed misconduct by asking for Evangeline McKoy to remain in the courtroom knowing full well that she was likely to have another outburst. Petitioner contends that this denied him his Constitutional right to a fair trial.

Respondents assert that this issue was addressed by the Supreme Court of Pennsylvania in Marshall I as a claim of trial error. The Supreme Court in Marshall III refused to revisit the issue after it was repackaged as a prosecutorial misconduct claim. Respondents contend that this issue is without merit and that the Supreme Court properly addressed the matter. Respondents argue that the admission of Evangeline McKoy's testimony and the outburst she had after her testimony did not deprive petitioner of fundamental fairness in his trial. I agree.

The Supreme Court of Pennsylvania addressed both the testimony and outburst of Evangeline McKoy as follows:

> [Petitioner] next argues that he was prejudiced when the mother of Myndie [sic] McKoy (one of the victims) interrupted the proceedings with an emotional outburst against [petitioner]. He now argues that this outburst could only be cured by the grant of a

mistrial. We disagree. The harm caused by such an outburst can be cured by an immediate curative instruction to the jury. Commonwealth v. Duffey, 519 Pa. 348, 548 A.2d 1178 (1988). Here, the trial court immediately cautioned the jury that it should ignore the outburst and to decide the case exclusively on the evidence and not on emotion, sympathy or prejudice. Given the fact that the outburst was brief, occurred only once, and was followed by an immediate instruction to the jury, we are satisfied that any prejudice was diffused and that [petitioner's] fair trial was not threatened. The trial court did not abuse its discretion in refusing the motion for mistrial. Commonwealth v. Colson, 507 Pa. 440, 490 A.2d 811 (1985).

[Petitioner] next argues that Mrs. McKoy should not have been permitted to testify as her testimony was cumulative. The trial court found her testimony to be admissible because it tended to establish that last time her daughter was seen alive, which consequently helped to establish when the murders were committed. The trial court also ruled the testimony to be admissible to establish Myndie's [sic] identity, since Mrs. McKoy identified her daughter's body for the police. Whether such testimony was cumulative was for the trial court to determine, and we will not reverse that decision absent an abuse of discretion. None has been demonstrated here and [petitioner's] contrary assertions are rejected.

Marshall I, 568 A.2d at 596-97. I find no error in the analysis undertaken by the Supreme Court. I must show deference to its determinations. The admission of Mrs. McKoy's testimony in this case did not deprive petitioner of the fundamental fairness of his trial and provides no basis for federal habeas corpus relief. Contrary to petitioner's assertions, the testimony did have a proper purpose as set forth by the Supreme Court. The Commonwealth prosecutor cannot have committed misconduct by presenting proper evidence.

The Supreme Court's determination of the issue of Mrs. McKoy's outburst is also correct. After the outburst, the trial court immediately gave a curative instruction. The jury is presumed to have followed the court's instruction. See Weeks v. Angelone, 528 U.S. 225, 234, 120 S. Ct. 727, 733, 145 L. Ed. 2d 727, 738 (2000). Moreover, as noted in the trial transcript,

Mrs. McKoy testified in a calm fashion, walked past petitioner on her way to the witness stand and back to the gallery. The prosecutor had given assurances to the court previously that she would not be disruptive on the witness stand, which by inference he must have discussed her testimony and conduct with her prior to her testifying. N.T. 8/24/84 at 94. The outburst happened about five minutes after she sat in the gallery and had nothing to do with anything the prosecutor did at the time. Id. In addition, the trial court observed that she testified very calmly, nothing in particular happened, then all of a sudden, the court heard a noise, Mrs. McKoy started to cry and she started to scream, but not outrageously. Id. at 94-95. The court commented that "[s]he did scream but I could picture her screaming a lot louder." Id. at 95.

I find nothing in the record to conclude that the prosecutor engaged in misconduct by asking to let Mrs. McKoy remain in the courtroom after her testimony. She acted completely appropriately during her testimony, was in close proximity with petitioner without making any comments or outbursts and seemed to just snap for no apparent reason.

Finally, the determination of the Supreme Court of Pennsylvania was neither contrary to, or an unreasonable application of, United States Supreme Court precedent. This is borne out in the decision of the United States Supreme Court in Carey v. Musladin, 549 U.S. 70, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006). In Carey, the Supreme Court noted that it had never addressed a claim that "private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial." 549 U.S. at 76, 127 S. Ct. at 653, 166 L. Ed. 2d at 488. The Supreme Court concluded that its lack of holdings in this area of the law precluded a finding that a state court "unreasonably applied clearly established federal law. Id. at 549 U.S. at 77, 127 S. Ct. at 654, 166 L. Ed. 2d at 489 (citing 28 U.S.C. § 2254(d)(1). Accordingly, for all the foregoing reasons, this aspect of Claim VIII is denied.

**(c)** **Misconduct Based on Comments by the Prosecutor at Closing Argument .**

Petitioner claims that the prosecutor made numerous improper comments during his closing argument to the jury at the guilt phase of his trial. In addition, petitioner contends that the closing argument was little more than a loosely-connected series of improper, inflammatory statements that individually and collectively deprived him of a fair trial.

The United States Supreme Court has held that federal habeas corpus relief may be granted when "the prosecutorial misconduct may 'so infect the trial with unfairness as to make the resulting conviction a denial of due process.'" Greer v. Miller, 483 U.S. 756, 765, 107 S. Ct. 3102, 3109, 97 L. Ed. 2d 618, 630 (1987) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (4 S. Ct. 1868, 1871, 40 L. Ed. 2d 431, 437 (1974). The Supreme Court further stated that for due process to be offended "the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial." Id. (citations omitted). This determination will at times, require the court to draw a fine line between ordinary trial error and conduct so egregious that it amounts to a denial of due process. See Werts, 228 F.3d at 198. In order to evaluate whether the remarks of a prosecutor rise to the level of a constitutional violation, the court must examine them in the context of the whole trial. Id.

In Werts the Third Circuit discussed the concept of the prosecutor responding to arguments made by defense counsel in closing arguments as follows:

> Viewing the prosecutor's remarks during the heat of argument,
> counsel may make remarks that are not supported by the testimony
> and which are or may be prejudicial to the defendant. United States
> v. Young, 470 U.S. 1, 8 & 10, 84 L. Ed. 2d 1, 105 S. Ct. 1038
> (1985) (citation omitted). Where in a criminal trial, defense
> counsel argues improperly, thereby provoking the prosecutor to
> respond in kind, and the trial judge does not take any corrective
> action, a criminal conviction will not be "overturned on the basis
> of a prosecutor's comments standing alone, for the statements or

-47-

conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." Id. at 11. Thus, in analyzing the effect of the prosecutor's remarks on the outcome of the trial, courts will consider the "invited response" or 'invited reply" rule, i.e., whether "defense counsel's comments 'clearly invited the reply.'" Id. (quoting Lawn v. United States, 355 U.S. 339, 359-60 n. 15, 2 L. Ed. 2d 321, 78 S. Ct. 311 (1958)).[64] Thus, "the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly." 470 U.S. at 12. This analysis requires the reviewing court to weigh not only the impact of the prosecutor's remarks, but also to consider defense counsel's statement. Id. If the prosecutor's comments were "invited," and went no further than required to "right the scale" such remarks would not warrant overturning a conviction. Id. at 12-13.

228 F.3d at 198-99. It is under this guidance that I analyze the statements made by the

prosecutor in closing arguments.

Initially, petitioner contends that the prosecutor began his argument by telling the jury

that the role of the defense counsel is to lie on behalf of his client. The statement petitioner

complains of is as follows:

> The first thing that I want you to understand is this is an adversary system. Adversary system which means that the two sides take opposing views. By its mere nature, if I say today is Tuesday and if we want to have a trial, Mr. McAllister would have to dispute that.

N.T. 8/28/84 at 40-41. Petitioner contends that by this statement, the prosecutor informed the

jury that defense counsel has an obligation to lie on behalf of his client and that such an

argument is improper. Respondents contend that this statement is taken out of context and was

meant to illustrate the adversarial relationship between the prosecution and the defense.

Furthermore, respondents argue that read in context, the prosecutor was merely responding to the

---

[64]     The Court noted that its recognition of the "invited response" rule in Lawn and earlier cases should not be construed as approval or encouragement of such improper remarks. Rather, the focus should be on "whether the prosecutor's 'invited response' taken in context, unfairly prejudiced the defendant." Id. at 12.

defense closing argument wherein defense counsel attacked every portion of the Commonwealth's case. For the following reasons, I agree with respondents and find no prosecutorial misconduct.

The remainder of the beginning of the prosecutor's closing argument went as follows:

> If I put on 10 witnesses, Mr. McAllister somehow will argue why didn't I put on 20. If I put on one hundred witnesses, his argument would be probably that the Commonwealth overkilled in its presentation of its evidence.
>
> If we had videotapes, if we had electronic surveillance some fault would be found in that. I read recently of an instance of an on camera bank robbery that an expert was brought in to say the person shown in the photograph didn't have a forehead that fit the profile of the robber.

Id. at 41. Taking the rest of the first two paragraphs of the prosecutor's closing argument as a whole, it is clear what was attempted was to set forth the role of defense counsel. That was not that he had an obligation to lie, which was never stated, rather, to give a quick and appropriate indication to the jury what the adversary system is about. Defense counsel's role is to try and put holes in the Commonwealth's case and to question everything on behalf of his client. Defense counsel had just spent his closing argument attempting to do exactly that by questioning the veracity of each witness' testimony, the conduct and veracity of the police and prosecution and what evidence and witnesses were not presented by the Commonwealth.[65] I find no misconduct by the prosecutor. Moreover, I do not find that the fairness of defendant's trial was compromised in any way by these statements. Finally, it was proper argument under the "invited reply" rule. Werts, supra.

Next, petitioner contends that the following statement by the prosecutor about defense counsel constitutes misconduct.

---

[65] See N.T. 8/28/84 at 11-40.

> This case, this tragedy, this elimination of three people, one side you have Mr. McAllister arguing it is orchestrated by the people you see sitting right here. Do you believe that?
>
> He indicated that there should be something independent to back up what these men say. I figured he would say something like that because when in law school a wise old professor who was about to retire once said, when you have the facts on your side, you argue the facts. When you have the law on your side you argue the law. When you have neither you stand up and you point an accusing finger at someone.
>
> Today Mr. McAllister would have you believe these three men made it up. Do you believe that?

N.T. 8/28/84 at 41-42.

A review of the complete context in which the statements by the prosecutor were made, indicate that the statements were made in direct response to the closing argument made by defense counsel. The prosecutor directly states that it is in response to arguments made by defense counsel. Again, this is proper "invited reply". Werts, supra. In addition, I do not find that this statement alone or in combination with the prior statements about defense counsel compromised the fairness of petitioner's trial in any way, let alone to the level of a Constitutional due process violation.

Next, petitioner contends that in the following statement to the jury during closing arguments the prosecutor improperly focused on the discovery of decomposing bodies in an attempt to appeal to their emotions. The relevant portion of the prosecutor's closing argument is as follows:

> We took you back in a clinical setting, to the smell of decomposing bodies. We took you back to the shock and horror of removing the mattress and finding three human beings dead and decomposing, two 20 year olds and one two and a half year old. The site was not pretty but this is what we had to start with and this is in fact what we started with. We started with three dead bodies.

. . .

Before you, ladies and gentlemen, you see all that remains of three human beings, Myndi McKoy, the knee length socks, the white bra, the West Catholic sweatshirt with the name Myndi on the back. For Sharon Ballard, you see the cords and ligatures taken from around her neck. For Sharon Karima Sanders [sic] you see a pair of Buster Brown shoes, the clothing she wore.

Other than the Great Depression, Herbert Hoover said, "One other thing that I think comes to play here." He says, "A child has two things to be. One is to be a child and the second thing is to grow up to be a man or woman." Karima Sanders [sic] does not have that chance and, ladies and gentlemen, that is why I am standing up here and I'm asking you to do to do you duty, to bring justice to bear on a person if you believe the witnesses and if you believe that statement….

. . .

Now, it is nothing, I can say to minimize the one package that you don't have here before you today and that's the sense of loss, but you are not to be swayed by any sympathy for the victims. You are not to be swayed by any sense of revenge. I'm not asking you that.

N.T. 8/28/84 at 43, 44-45.

In addition to challenging the statement about decomposing bodies, petitioner contends that the prosecutor's reference to Karima Saunders not having the opportunity to grow up was especially prejudicial, inflammatory and irrelevant to the question of whether petitioner was guilty of her murder. Petitioner further contends that it constituted impermissible victim impact argument offered only to inflame the jury's emotions, with no relevance or probative value.

Respondents contend that what prosecutor said in these statements to the jury was to comment on the evidence presented at trial and to point out reasonable inferences from the evidence. Moreover, respondents argue that the prosecutor's reference to Karima Saunders never having the chance to grow up is not victim impact evidence. I agree with respondents.

Initially, I note that in his closing argument to the jury, defense counsel referenced the odor that was in the victim's home when he stated: "Young Mr. Burley entered the apartment according to his testimony with his mother seeking to take something from there. His shirt or some clothing. He was in the apartment for many minutes and all he noticed was the heat and the unusual odor." N.T. 8/28/84 at 16. Thus, the prosecutor referencing the odor of the decomposing bodies was clearly in response to defense counsel making the same reference in his closing argument. I find no prejudice to defendant in the prosecutor stating what defense counsel had already stated. Again, this is proper "invited reply". <u>Werts</u>, <u>supra.</u> Accordingly, this portion of Claim VIII is denied.

Regarding the prosecutor's closing statement that Karima Saunders would never have the chance to grow up, this statement is not improper victim impact argument. "Victim impact evidence consists of evidence concerning the victim and the impact that the death of the victim has had on the family of the victim." <u>Commonwealth v. Bomar</u>, 473 Pa. 426, 457, 826 A.2d 831, 850 (2003) (citing 42 Pa.C.S.A. § 9711(a)(2); <u>Commonwealth v. McNeil</u>, 545 Pa. 42, 55-6, 679 A.2d 1253, 1259-60 (1996). Also, in <u>Payne v. United States</u>, 501 U.S. 808, 131 S. Ct. 2597, 115 L. Ed. 2d 720 (1991), the United States Supreme Court noted that victim impact evidence "is designed to show each victim's 'uniqueness as an individual human being.'" 501 U.S. at 823, 131 S. Ct. at 2607, 115 L. Ed. 2d at 734.

Here, the prosecutor did not comment about the victim's character or her uniqueness as a human being. Moreover, the prosecutor's remark did not speak to the effect of the victim's death on her family. Thus, contrary to petitioner's assertion, I conclude that this statement did not constitute improper victim impact argument. Accordingly this portion of Claim VIII is also denied.

The petitioner further objects to the prosecutor's use of the word "nightmare" in the following context:

> I don't want you to equivocate and all we want is justice. All we want is first degree murder for if in your heart of hearts you can think or have a nightmare about what kind of person that could do this to three people, at different times using different methods, using different types of ties, different types of ligatures, the search and the watching of life go out of their body….

N.T. 8/28/84 at 53. Petitioner contends that the prosecutor incited jurors' fears and such appeals to passion and prejudice are clearly improper. Respondents contend that the prosecutor was arguing for a first degree murder verdict rather than some lesser compromise. Respondents argue that defense counsel had characterized the Commonwealth's evidence as a "spurned lover's case"[66] and considering the apparent motive for the murder of Sharon Ballard contained in petitioner's confession, the possibility that the jury would conclude that petitioner acted out of passion was reasonable. Respondents further contend that the statement was proper and constituted an aside that any thought of the doer of these deeds is in effect a nightmare. It was the deeds that were condemned as a nightmare, not petitioner, personally.

On direct appeal, the Supreme Court of Pennsylvania analyzed this statement as follows:

> It seems to us that the prosecutor was referring to the type of person that would commit such terrible crimes and we cannot say that the unavoidable effect of this isolated characterization was to prejudice the jury against [petitioner].
>
> There was no question that the crimes were grizzly and that a prosecutor would refer to these facts during closing and ask the jury to keep these facts in mind when it decided whether a verdict of murder of the first degree was appropriate. It was in this context that the prosecutor referred to the type of person that committed such acts and, because the reference is linked to the evidence presented in the case, we are satisfied that any reference to [petitioner] was not unduly prejudicial nor did it fix a bias or hostility against him that made it impossible for the jury to weigh

---

[66] N.T. 8/28/84 at 14.

the evidence objectively and render a true verdict. We detect no
such prejudice here, especially where the trial court in its charge
made sure to advise the jury to determine the guilt or innocence of
the accused based on the evidence and not on any extraneous
factors.

Marshall I, 568 A.2d at 597-98 (citations omitted). I find no error in the analysis undertaken by

the Supreme Court and show deference to its determinations. The prosecutor was permitted to

make argument based upon the facts in evidence and the reasonable inferences therefrom. There

is no prosecutorial misconduct in these statements made by the prosecutor, much less enough

misconduct that would "so infect the trial with unfairness as to make the resulting conviction a

denial of due process." Greer, 483 U.S. at 765, 107 S. Ct. at 3109, 97 L. Ed. 2d at 630.

Moreover, there is no indication that the decision of the Supreme Court of Pennsylvania

regarding this statement at closing argument was "contrary to, or involved an unreasonable

application of, clearly established Federal law" or was "based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)

(1)-(2). Petitioner's claim fails under the AEDPA standard. Accordingly, this portion of Claim

VIII is denied.

Next, petitioner contends that the prosecutor in his closing argument engaged in improper

vouching when he assured the jury that he and the police had not fabricated petitioner's

confession.

A prosecutor's expression of personal opinion about the
credibility of witnesses or the guilt of a defendant creates a risk
that the jury will 'trust the Governments judgment rather than its
own view of the evidence." United States v. Young, 470 U.S. 1,
18-19, 84 L. Ed. 2d 1, 105 S. Ct. 1038 (1985). However, the fact
that a prosecutor made improper statements is insufficient, by
itself, to require a new trial. To obtain such relief, a defendant must
also demonstrate that the prosecutor's improper statements
prejudiced his defense. See United States v. Gross, 961 F.2d 1097,
1108 (3d Cir. 1992) (citing United States v. Swinehart, 617 F.2d

-54-

> 336, 339 (3d Cir. 1980)), <u>cert.</u> <u>denied</u> 506 U.S. 965 (1992). In examining whether the prosecutor's statements prejudiced the defense, our precedents have considered whether the comments suggested that the prosecutor had knowledge of evidence other than that which was presented to the jury. <u>See</u> <u>id.</u>

<u>Buehl v. Vaughn</u>, 166 F.3d 163, 176 (3d Cir. 1999). Petitioner argues that this "assurance" to the jury that "we" had not fabricated petitioner's confession suggested to the jury that the prosecutor was personally aware of the validity of the confession, based upon evidence not presented to the jury.

Petitioner further contends that at the end of his closing argument, the prosecutor placed his personal credibility before the jury. Finally, petitioner asserts that the prosecutor also improperly discussed sentencing issues at the guilt stage of petitioner's trial.

Respondents argue that the prosecutor properly responded to defense counsel's closing argument that the evidence against petitioner, including his confession, was fabricated by the Commonwealth and that he was framed for the murders. Respondents contend that defense counsel's closing argument included attacks on the integrity of the prosecutor, the medical examiner and the police. Thus, respondents assert that the statement in closing argument refuting those allegations in defense counsel's closing argument was proper.

In addition, respondents contend that the prosecutor did not place his personal credibility before the jury. Rather, the prosecutor simply suggested what the jury was likely to conclude after independently reviewing the evidence, including petitioner's confession. Respondents assert that there was nothing improper about arguing what conclusions should be drawn from the evidence and asking for a first degree murder verdict. Finally, respondents deny that the prosecutor injected sentencing issues into his guilt phase closing arguments.

The statements that petitioner complains of are as follows:

Now, Mr. McAllister argues that this is a fabricated statement. If we were constructing a frame, don't you think that the good Doctor Aronson would have been in on the frame? Do you think if this was a frame that Doctor Aronson couldn't say I ordered acid phosphotase test and that would show some sexual activity?

Myndi was in the other room, the other bedroom, the baby was asleep at the [foot] of the bed. After the sex Sharon fell asleep.

I would submit to you, ladies and gentlemen, that there is facts in this particular statement and I will ask you to believe that only the killer knew.

N.T. 8/28/84 at 47. The word that petitioner contends is improper is the word "we". Petitioner

further contends that use of the word "we" later in his argument is also improper.

Ladies and gentlemen, the Commonwealth will make your job easier and not like the self-correcting typewriters, not like the calculators that they hand out now in high school to help you solve problems. We'll solve it for you. We will demand that you return one verdict and one verdict alone, guilty of murder in the first degree.

Enough words been said, enough of the illusion that somehow Jerome Marshall is persecuted. We're not prosecuting out of any sense of revenge. We're prosecuting him out of a sense we can't live with his activity. We can't live with the activity where two and a half year old is killed because they cry, that a 20 year old is killed because she screamed, that a 20 year old is killed because she made a choice to marry someone else.

Id. at 50-51. Additionally, petitioner complains of the following statement.

I would submit to you, ladies and gentlemen, in closing, I could stand here and look at the victims, have vivid recollections of what they were and I only could shed tears but that wouldn't help now. The only thing that will help you, the buck stops here. All here and now. It's for you to bring to bear all of those things, all of those things that are good, all of those things that are fair, all of those things that are just and in bringing to bear all of those things here in this courtroom, not on the street corner, on the living room, in a living room or your rec room where you might have been, now. They are you and I want you to come back in here, ladies and gentlemen, after the charge and I want you to stand up

and look him in the eye, show more courage than he did when he
snuffed out the life of the two and a half year old and he says in his
statement and he tells you I couldn't look. Look him in the eye and
announce your verdict of guilty of murder in the first degree and I
will assure you if you do that, you would have done justice and
after you have done justice I hope to be standing up here again at
another proceeding making another statement about how you
should do complete justice and I want you to look at him and I
want you to look at him for what he is and what [sic] he is not the
figment of this detective's imagination or that detective's
imagination or even Lieutenant Shelton's imagination.

Id. at 52-53.

In the first passage, the reference to the word "we" was not improper vouching. Rather, it
reflected the prosecutor's reply to defense counsel's attacks on him, the police and Dr. Aronson
in an attempt to rebut defense counsel's argument that petitioner's confession was fabricated by
the Commonwealth. It was proper "invited reply", Werts, supra, not improper vouching as
alleged by petitioner. Moreover, I find that there was no prejudice to petitioner in this statement.
The jury could have clearly understood the context of this statement, there is no fixed bias or
hostility toward petitioner in the statement. The prosecutor did not infer that he had knowledge
of any evidence that was beyond that presented to the jury. Buehl, supra.

I conclude that this statement does not create any possibility that the fairness of
petitioner's trial was compromised in any way by this statement, let alone being egregious
enough to rise to the level of a Constitutional violation.  Accordingly, this portion of Claim VIII
is denied.

The second passage also includes the word "we". It is again proper argument, in part
arguing the facts as set forth in petitioner's confession. The "we" spoken of is the
Commonwealth as borne out in the first line of the passage. The statement simply requests that
the jury return a verdict of guilty based upon the facts of the case. I find nothing improper about

this statement and it is not improper vouching as alleged by petitioner. It does not imply that the prosecutor was in possession of evidence that was not already before the jury. <u>Buehl</u>, <u>supra</u>. Furthermore, this passage is proper "invited reply" to dispel defense counsel's argument that petitioner's confession was fabricated. <u>Werts</u>, <u>supra</u>. Again, I find no prejudice to petitioner and this statement clearly does not rise to the level of egregiousness to implicate a Constitutional violation. Accordingly, this portion of Claim VIII is denied.

The final passage cited above implicates two separate claims by petitioner. First, petitioner contends that the prosecutor injected his personal credibility before the jury by stating "I will assure you if you do that, you would have done justice". Here, I conclude that petitioner takes this statement out of the context it was given.

The context the statement was given was the prosecutor asking the jury to do its job and look at the evidence. He made an analogy to petitioner's confession where petitioner stated that he could not look at Karima Saunders when he killed her. The prosecutor simply asks the jury to do what petitioner could not, look petitioner in the eye when they come back with a verdict of guilty. This is not putting the prosecutor's credibility at issue.

The prosecutor did not imply that he had evidence outside that before the jury. <u>Buehl</u>, <u>supra</u>. Moreover, there is no prejudice to petitioner by this statement, certainly not to an egregious level to constitute a Constitutional violation. Accordingly, this portion of Claim VIII is denied.

The second portion of the last passage that petitioner contests is that the prosecutor improperly injected sentencing issues into the guilt phase of the trial by stating that he would soon be before them again. That is an incorrect statement of what the prosecutor said. The prosecutor stated "after you have done justice **I hope to be standing up here again** at another

proceeding making another statement about how you should do complete justice…." N.T. 8/29/84 at 53 (emphasis added).

This statement does not state or imply that the prosecutor **would be** talking to them again at another proceeding (presumably sentencing) as argued by petitioner. Rather, it states a hope that he will be before the jury again. The hope the prosecutor spoke of was that the jury will convict petitioner of the crimes. It is not improper for a prosecutor to hope that the jury will convict when that is exactly what he was asking to jury to do. He implied that the evidence supported a conviction in this matter. That is proper closing argument.

This statement is not prejudicial to defendant. I do not find that this statement alone, or in combination with the prior statements alleged to be improper vouching compromised the fairness of petitioner's trial in any way, let alone to the level of a Constitutional due process violation. Accordingly, this aspect of Claim VIII is denied.

Finally, petitioner contends that three separate statements by the prosecutor during closing arguments were improper. Two of the statements had a religious connotation. In the first statement, the prosecutor paraphrased scripture:[67]

> I would submit to you, ladies and gentlemen, that there is facts in this particular statement and I will ask you to believe that only the killer knew.
>
> A lot of things had been working on my mind. It was like she was a witch. She had just told me that I would have to leave because the guy was coming back from the Army. It's just a lot of things but while she was sleeping I got this clothes line.
>
> Now, the Judge will charge you on voluntary manslaughter. Voluntary manslaughter is a killing of another human being in the heat of passion and with sufficient provocation brought on by the dead person, and he'll tell you mere words, mere touching or a mere insulting is not in the eyes of the law sufficient provocation. He will further tell you if there is provocation without passion, you

---

[67] Matthew, Chapter 25, Verse 40.

don't have manslaughter and if you have provocation, if you have passion and not provocation, that is not manslaughter.

I would ask you what could a sleeping person do if you believe this to inspire Mr. Marshall to go to the kitchen area, to search out a means to bring about her death. To put the ligature around her neck and put it tight until she was dead. **I would ask you and it is written, whatever you do to the least of thine brethren you do to me.** I'll ask you who are the least of these.

Could it be a 20 year old who is laying there asleep? Could it be a two and a half year old who only cried for her Mother. Could it be another 20 year old who woke up in the middle of what happened and as Mr. Marshall said if you believe the statement,

N.T. 8/28/84 at 48 (emphasis added).

The second reference was a combination of principles espoused by Dr. Martin Luther

King and a reference to Christ as follows:

In closing, ladies and gentlemen, I would ask you in the words of Doctor King and letters from a Birmingham jail, you say that our actions speaks [sic] at violence. Isn't this what Jerome Marshall is saying about Sharon Ballard, Myndi McKoy and Karima Sanders [sic]? And Doctor King added, isn't this like condemning a rich man for having made it when the robber takes it? Isn't it like condemning Socrates for his unswerving search for truth or isn't it like condemning Christ for the act of crucifixion.

Id. at 52.

The third statement questions what kind of man petitioner is:

Mr. McAllister in his humane plea to the ladies and gentlemen of the jury omitted the last line of the statement [that petitioner gave to the police] and I ask you to ask yourself **what kind of man is Jerome Marshall or is he a man at all** when he answers this question. Question, is there anything else you wish to add to this interview?

Answer, yes, I'm glad it's over.

Is he talking about the running. The dodging of the police, the inability to pick up his welfare check? I feel a lot better now

-60-

> that I told somebody about what happened that day and got the
> whole thing out in the open. See, this would not ever have
> happened if Sharon hadn't had been the person that she was. She
> just wanted to use me and take my money.

N.T. 8/28/84 at 51 (emphasis added).

Petitioner contends that the two religious comments are not proper closing argument and relies on a number of cases from other circuits.[68] None of these cases are particularly helpful to petitioner because they all involve religious references made during the penalty phase and involve biblical references that implore the jury to follow God's law and impose the death penalty or to not show the defendant mercy based on biblical teachings. We do not have that situation here, thus, I find petitioner's reliance on these cases misplaced. Moreover, I note that petitioner makes no argument at all what is improper about the prosecutor's comment about what kind of man Mr. Marshall is. Petitioner simply states that it is improper.

Respondents argue that the first comment, "I would ask you and it is written, whatever you do to the least of thine brethren you do to me", is taken out of context. Respondents contend that taken in context, what the prosecutor stated was a fair response to petitioner's claim that he was somehow provoked by the sleeping victims and acted in the heat of passion. Respondents further contend that the prosecutor was merely arguing, with a degree of oratorical technique, that it would be absurd to conclude that petitioner's vicious acts were "provoked" by the most vulnerable of people, two sleeping women and a sleeping toddler.

As noted above, the prosecutorial misconduct must "so infect the trial with unfairness as to make the resulting conviction a denial of due process" and that for due process to be offended "the prosecutorial misconduct must be of sufficient significance to result in the denial of the

---

[68] See Romine v. Head, 253 F.3d 1349 (11th Cir. 2001); Sandoval v. Calderon, 241 F.3d 765 (9th Cir. 2000); Cunningham v. Zant, 928 F.2d 1006 (11th Cir. 1991); and Cobb v. Wainwright, 609 F.2d 754 (5th Cir. 1980).

defendant's right to a fair trial." Greer, 483 U.S. at 765, 107 S. Ct. at 3109, 97 L. Ed. 2d at 630. This requires the court to draw a fine line between ordinary trial error and conduct so egregious that it amounts to a denial of due process. See Werts, 228 F.3d at 198. In order to evaluate whether the remarks of a prosecutor rise to the level of a constitutional violation, the court must examine them in the context of the whole trial. Id.

Here, at most, this comment by the prosecutor might constitute ordinary error.[69] I agree with respondents that this comment is in response to petitioner's claim that he was somehow provoked by the victims, but it may take argument by counsel to its limit. However, I conclude that in the context of the whole trial and taking into account that while the statement does paraphrase a biblical passage, the prosecutor did not specifically reference the passage as being from the Bible and this fleeting reference taken in the context of the whole trial, together with the instructions given by the trial court during its charge to the jury do not rise to the level of a constitutional due process violation. Accordingly, I deny this portion of Claim VIII.

Next, the second religious comment made by the prosecutor was reviewed by the Supreme Court as follows:

> [Petitioner] next refers to the prosecutor's alluding to Jesus Christ in his closing. In speaking about [petitioner's] confession, the prosecutor noted that [petitioner] told the police that he would not have killed his victims, if Sharon hadn't been the person she was. "She just wanted to use me and take my money." The prosecutor answered [petitioner's] justification for killing three people as follows: ". . . isn't this like condemning a rich man for having made it when the robber takes it? Isn't it like condemning Socrates for his unswerving search for truth or isn't it like condemning Christ for the act of crucifixion." Taken in context, this statement is an ironic reply to [petitioner's] attempt, in his confession, to

---

[69] I note that in Commonwealth v. Chambers, 528 Pa. 558, 599 A.2d 630 (Pa. 1991), the Supreme Court of Pennsylvania held that references to the Bible or any other religious writing in support of the death penalty during the penalty phase of trial is per se reversible error and may subject the violator to disciplinary action. 528 Pa. at 586, 500 A.2d at 644. The reference to the biblical passage in this case did not come during the penalty phase and was seven years prior to the Supreme Court's decision in Chambers.

> shift blame to the victim for her death. We do not view the
> prosecutor's reference to these figures as anything other than
> rhetoric meant to dispel [petitioner's] attempt at self-justification.
> Such an argument does not create a fixed bias or hostility toward
> [petitioner] and therefore is not a ground for a new trial.

Marshall I, 568 A.2d at 597.

The Supreme Court's determination that this claim fails was not "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (1)-(2). Furthermore, I agree with the Supreme Court that this comment is in response to petitioner's claim that he was somehow provoked by the victims. This reference taken in the context of the whole trial, together with the instructions given by the trial court during its charge to the jury do not rise to the level of a constitutional due process violation. Therefore, under the deference that must be afforded under the AEDPA standard, this portion of Claim VIII is denied.

In the third statement that petitioner contends constitutes prosecutorial misconduct, the prosecutor questioned what kind of man, if any, petitioner was. As noted above, petitioner makes no argument why this statement is of such magnitude that it constitutes a due process violation. Generally, bald assertions and conclusory allegations of a constitutional violation do not provide sufficient grounds for habeas relief. See Zettlemoyer v. Fulcomer, 923 F.2d 284 (3d Cir. 1991); See also Mayberry v. Petsock, 821 F.2d 179 (3d Cir. 1987).

Respondents contend that this statement was in response to petitioner's failure to take responsibility for his actions, which he attempted to blame on decedent Sharon Ballard. I agree. Moreover, I do not find that this statement alone, or in combination with the three prior

statements, compromised the fairness of petitioner's trial in any way, let alone to the level of a Constitutional due process violation. Accordingly, this aspect of Claim VIII is denied.

Finally, petitioner contends that his prior counsel were ineffective for failing to raise some of the statements by the prosecutor in closing argument on direct appeal or PCRA appeal. Counsel will not be found ineffective for failing to present an unmeritorious claim or objection. Johnson v. Tennis, 549 F.3d 296, 301 (3d Cir. 2008). Because counsel cannot be ineffective for failing to raise issues that have no merit, and I have found that all of the foregoing statements complained of in Claim VIII are without merit, I deny this aspect of Claim VIII.

Moreover, the Supreme Court of Pennsylvania ruled that the ineffective assistance of counsel claims were waived because petitioner failed to adequately develop them in his brief on PCRA appeal citing Commonwealth v. Bracey, 568 Pa. 264, 795 A.2d 935 (Pa. 2001) as authority for that proposition.[70] See Marshall III, 812 A.2d at 544 n. 2. The Third Circuit has recently ruled that failure to meaningfully develop a claim and support it with legal authority is an independent and adequate state law ground that gives rise to procedural default. See Leake v. Dillman, 594 Fed. Appx. 756, 758-59 (3d Cir. 2014). Thus petitioner's ineffective assistance of counsel claims contained in Claim VIII are procedurally defaulted.

---

[70]    In Marshall III, the Supreme Court of Pennsylvania stated:

> At the end of his argument relating to several of these waived claims, [petitioner] tacks on a bald and conclusory allegation that prior counsel were ineffective for failing to raise and/or properly litigate the underlying claims of error. Then, in his twenty-fifth issue on appeal to this Court, [petitioner] alleges, again in a bald and cursory fashion, that all prior counsel were ineffective for failing to raise and/or properly litigate the various issues included in his appellate brief. This Court has previously held that such an undeveloped argument, which fails to at any point meaningfully discuss and apply the standard governing the review of ineffectiveness claims, simply does not satisfy [petitioner's] burden of establishing that he is entitled to relief under the PCRA. See Commonwealth v. Bracey, 568 Pa. 264, 795 A.2d 935, 940 n. 4 (Pa. 2001)

Petitioner may salvage his default if he can establish cause and prejudice. <u>Murray v. Carrier</u>, 477 U.S. at 488, 106 S. Ct. at 2645, 91 L. Ed. 2d at 409. Here, he cannot establish cause because the ineffectiveness of PCRA appeal counsel is not cause under <u>Martinez</u>. <u>Davila</u>, <u>supra</u>. Also, the "ineffectiveness or incompetence of counsel during federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254(i).

Finally, petitioner has made no effort to produce new, reliable evidence of actual innocence to overcome his procedural default. Thus, the miscarriage of justice exception does not apply. <u>Schlup v. Delo</u>, 513 U.S. 298, 321-22, 115 S. Ct. 851, 864-65, 130 L. Ed. 2d 808, 832 (1995).

> **7.**      **Claim XIII: An Adequate Record of the Trial Was Not Prepared and/or Was Not Provided to Petitioner's Counsel, Depriving Him of His Rights to Meaningful Appellate Review, the Effective Assistance of Appellate and Post-Conviction Counsel, and Full and Fair Adjudication of His Post-Conviction Claims.**

Petitioner alleges that he was deprived of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the trial record is incomplete. Specifically, he complains that some side bar discussions were not recorded, and that there is not a transcript of the afternoon session of voir dire from July 23, 1990. The Pennsylvania Supreme Court denied this claim on PCRA review because it found that petitioner:

> fail[ed] to raise any potentially meritorious challenge that [could not] be adequately reviewed due to the absence of a record of the sidebar discussions from his trial and/or the transcript from the alleged voir dire session on the afternoon of July 23, 1990.

<u>Marshall III</u>, 812 A.2d at 551. This conclusion is not contrary to, nor an unreasonable application of, federal law.

The Third Circuit has explained that, although "a criminal defendant has the right to an adequate review of his conviction ... neither the Supreme Court, nor our Court, has held that due process requires a verbatim transcript of the entire proceedings or that an incomplete record confers automatic entitlement to relief." Fahy v. Horn, 516 F.3d 169, 190 (3d Cir. 2008).

In order to establish a claim for relief based on the insufficiency of the trial record, "a criminal defendant must first show a 'colorable need' for a complete transcript before the state must meet its burden of showing that something less will suffice." Id. (quoting Karabin v. Petsock, 758 F.2d 966, 969 (3d Cir. 1985)) (internal quotation marks omitted).  Petitioner has not articulated how the alleged insufficiency of the record prejudiced his appellate review, and no prejudice is apparent.

Petitioner has pointed to no meritorious claim he might raise arising out of some error that would be reflected by allegedly missing records of side bar discussions. With respect to the allegedly missing transcript of the afternoon session of voir dire from July 23, 1990, the only apparent claim petitioner might have would be an obstacle to presenting his Batson claim, which was discussed above. However, as I have already concluded, petitioner forfeited this claim by failing to raise a contemporaneous objection at trial. In addition, this portion of Claim XIII is moot because respondents have agreed to vacate petitioner's death sentences and will not seek the death penalty on resentencing.  Accordingly, the present claim is moot but also fails on its merits.

Moreover, even if petitioner had not forfeited his Batson claim, the alleged lack of a verbatim transcript from half-a-day of voir dire is insufficient to establish a claim for relief based on the alleged insufficiency of the record. As already discussed, petitioner's Batson claim with respect to his 1990 penalty phase retrial is now moot. Accordingly, the lack of a verbatim

transcript of a portion of the voir dire from that proceeding has not prejudiced him especially because respondents have agreed not to seek any death sentence in this case upon remand. Furthermore, it is unclear that a verbatim transcript would be the only way to reconstruct the requisite evidence--petitioner alleged in his Petition the races of those venirepersons that were allegedly peremptorily struck by the prosecutor. Hence, that information must have been available elsewhere. For all of the foregoing reasons, the state court's conclusion regarding this claim was not contrary to, nor an unreasonable application of, federal law. Accordingly, Claim XIII is denied.

        **8.**      **Count XXIII:  All Prior Counsel Were Ineffective for Failing to Raise and/or Properly Litigate the Issues Presented in These Collateral Proceedings.**

Petitioner contends that trial and direct appeal counsel (Attorney McAllister) was ineffective for failing to preserve any of the claims set forth in his petition. Petitioner further contends that penalty phase retrial and appellate counsel (Attorney Siegel) was also ineffective. The effectiveness of Attorney Siegel is moot because respondents have agreed to withdraw the death penalty in this case. Petitioner contends PCRA counsel and PCRA appeal counsel (Attorney Bruno) was also ineffective.

Issues of trial counsel's ineffectiveness have been addressed throughout this Opinion in conjunction with each of petitioner's substantive claims. I have found no ineffectiveness on the part of any counsel, so there can be no cumulative effect of counsel's ineffectiveness. Moreover, many of petitioner's ineffectiveness of counsel claims were procedurally defaulted as described in Count VIII. Finally, the ineffectiveness of PCRA and PCRA appeal counsel is not a ground for relief in a federal habeas corpus proceeding. 28 U.S.C. § 2254(i). Thus, I need not address this claim separately. Accordingly, Claim XXIII is denied.

**9.    Claim XXIV:  Petitioner is Entitled to Relief From His Conviction and Sentence Because of the Cumulative Effect of the Errors Described in This Petition.**

Each of petitioner's individual claims have been addressed within this Opinion. The portion of this claim that petitioner's convictions should be vacated because of cumulative errors fails because each of his individual claims fail.

The Pennsylvania Supreme Court addressed petitioner's cumulative error claim as follows:

> Finally, [petitioner] argues that even if this Court finds that he is not entitled to relief based on any of his particular claims, we should nevertheless find that he is entitled to relief because the cumulative effect of the errors described in his appeal was to deny him a fair trial. As this Court has stated before, however, "no number of failed claims may collectively attain merit if they could not do so individually." Commonwealth v. Williams, 932 Pa. 265, 278, 615 A.2d 716, 722 (1992). As none of [petitioner's] claims on appeal to this Court afford him post-conviction relief, we affirm the PCRA court's order denying relief.

Marshall III, 812 A.2d at 552.

"The cumulative error doctrine allows a petitioner to present a standalone claim asserting the cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of due process." Collins v. Sec'y of the Pa. Dep't of Corr., 742 F.3d 528, 542 (3d Cir. 2014) (citation omitted). The  Third Circuit has further stated:

> Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process. Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice.

Fahy, 516 F.3d at 205 (internal quotation marks omitted) (citations omitted). Here, I have found

no errors. Because there are no errors, I cannot find that there are cumulative errors that would

rise to the level of undermining the fundamental fairness of petitioner's trial rising to the level of

a due process violation.

Moreover, there is no indication that the decision of the Supreme Court of Pennsylvania

regarding this claim was "contrary to, or involved an unreasonable application of, clearly

established Federal law" or was "based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (1)-(2). Hence,

Petitioner's claim must fail under the AEDPA standard.

Finally, the argument that his death sentence for the murders of Myndie McKoy and

Karima Saunders should be vacated based on cumulative errors is moot because those sentences

have been vacated by agreement of respondents. Accordingly, Claim XXIV is denied in part and

denied as moot in part.

### 10. Claims XXVI, XXVII, XXVIII, XXX, XXXI, XXXII and XXXIII are Time-Barred.

#### (a) The AEDPA Statute of Limitations.

The AEDPA, enacted on April 24, 1996, imposes a one year period of limitations

("AEDPA year") for habeas corpus petitions. The time period begins to run from the latest of the

following:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C) the date on which the constitutional right was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)-(D). Because petitioner's judgment became final before April 24, 1996, petitioner had a one-year grace period from that date, until April 23, 1997, in which to timely raise claims under the AEDPA. See Douglas v. Horn, 359 F.3d 257, 261 (3d Cir. 2004). The Third Circuit has held that the starting date for the habeas period of limitations must be determined separately for each cognizable claim contained in the petition. See Fielder v. Varner, 379 F.3d 113, 117-18 (3d Cir. 2004).

On May 24, 1994, the Supreme Court of Pennsylvania affirmed the judgment of sentence for petitioner's murder of Karima Saunders after penalty phase retrial. Petitioner did not seek *certiorari* in the United States Supreme Court. Thus, the judgment on Petitioner's conviction became final on August 22, 1994, upon expiration of the ninety-day period for seeking *certiorari*. See U.S. Sup. Ct. R. 13(1). Claims XXVI, XXVII, XXVIII, XXX, XXXI, XXXII and XXXIII were not filed until well after petitioner's AEDPA year expired, therefore, unless grounds for statutory or equitable tolling can be demonstrated, these grounds must be dismissed.

### (b) Statutory Tolling.

Statutory tolling provisions state that: "[t]he time that a properly filed application for state post-conviction or other collateral relief with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this section." 28 U.S.C. § 2244(d)(2). A properly filed application for state collateral relief is one submitted in compliance with the applicable rules governing filings such as the form of the document, the time limits on

filing, the court and office in which it must be filed and the requisite filing fees.[71] Artuz v.

Bennett, 531 U.S. 4, 121 S. Ct. 361, 148 L. Ed. 2d 213 (2000). Answering a question left open in

*Artuz*, the United States Supreme Court later explained that, despite exceptions to the timely

filing requirement, an untimely PCRA petition is not "properly filed" and cannot statutorily toll

the federal habeas period of limitations. Pace v. DiGuglielmo, 544 U.S. 408, 125 S. Ct. 1807,

161 L. Ed. 2d 669 (2005).

Statutory tolling does not save petitioner's untimely claims. Petitioner did file a timely

PCRA petition on November 16, 1996; by then 206 days of his AEDPA year had expired,

leaving 159 days. Statutory tolling ceased on December 18, 2002 when the Pennsylvania

Supreme Court denied his PCRA appeal. See Lawrence v. Florida, 549 U.S. 327, 127 S. Ct.

1079, 166 L. Ed. 2d 924 (2007) (holding that statutory tolling ceases upon the state's highest

court denying review and does not include the time to seek *certiorari* in state collateral

proceedings). The remaining 159 days expired on May 26, 2003. Hence, Petitioner's new claims

contained in his motion to vacate, set aside or correct sentence filed April 22, 2015 were filed

nearly 12 years too late.

### (c)     Equitable Tolling.

Equitable tolling is available "only when the principle of equity would make the rigid

application of a limitation period unfair." Merritt v. Blaine, 326 F.3d 137, 168 (3d Cir. 2003)

(internal quotations omitted). Courts should be sparing when applying this doctrine. LaCava v.

Kyler, 398 F.3d 271, 275 (3d Cir. 2005). The general requirements for equitable tolling are:  (1)

Petitioner's diligence in pursuing his rights, and (2) the existence of extraordinary circumstances

that prevented timely filing. Holland v. Florida, 560 U.S. 631, 130 S. Ct. 2549, 177 L. Ed. 2d

---

[71]     The Supreme Court initially declined to decide whether the existence of exceptions to a timely filing requirement can prevent a late application from being considered improperly filed. *Artuz*, 531 U.S. at 8 n 2.

130 (2010). Petitioner bears the burden of proving both requirements. <u>Urcinoli v. Cathel</u>, 546 F.3d 269, 273 (3d Cir. 2008).

Petitioner has failed to demonstrate either his diligence or that extraordinary circumstances exist to justify his failure to submit Claims XXVI, XXVII, XXVIII, XXX, XXXI, XXXII and XXXIII prior to the expiration of his AEDPA year. In fact petitioner makes no argument on these points at all. Furthermore, petitioner makes no argument that any of these claims relate back to any claim raised in his original 25 claims. I find that Petitioner has not established he diligently pursued his rights or that extraordinary circumstances prevented timely filing. It is his burden to establish both, hence, I cannot equitably toll his AEDPA year. <u>Urcinoli</u>, 546 F.3d at 273.  Accordingly, Claims XXVI, XXVII, XXVIII, XXX, XXXI, XXXII and XXXIII are time-barred.

## VI.    CERTIFICATE OF APPEALABILITY

Pursuant to the Third Circuit Local Appellate Rules, "[a]t the time a final order denying a petition under 28 U.S.C. § 2244 or § 2255 is issued, the district judge will make a determination as to whether a certificate of appealability should issue." 3d Cir. L.A.R. 22.2 (2011).  The court shall issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

I find that jurists of reason would not contest the determination that petitioner's habeas corpus petition falls short of making a "substantial showing of the denial of a constitutional right."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-484, 120 S.Ct. 1595, 1603-1604, 146 L.Ed.2d 542, 554 (2000). Thus, a certificate of appealability is denied.

## VII.    CONCLUSION

For all the foregoing reasons, petitioner Jerome Marshall's Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 is granted by agreement in part, and denied in part.

Specifically, I grant petitioner relief from his death sentences based upon respondent's agreement to a conditional grant of petitioner's writ of habeas corpus with respect to the death sentences imposed for the murders of Myndie McCoy and Karima Saunders. Petitioner's death sentences for those murders are vacated. As a result Claims I, II, IX-XII, XIV-XXII, XV and XXIX are dismissed as moot. Those claims all relate to the death sentences themselves or the circumstances surrounding the jury imposing the death sentences.

The Petition for a Writ of Habeas Corpus is denied in all other respects without an evidentiary hearing.

I direct that this case be remanded to the Court of Common Pleas of Philadelphia County for resentencing consistent with respondents' concession that they will not seek the death penalty upon resentencing.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge